EASTERN-CENTRAL MOTOR CARRIERS ASSOCI-
ATION ET AL. *v.* UNITED STATES ET AL.

No. 105.   Argued December 15, 16, 1943.—Decided February 7, 1944.

*Mr. Charles E. Cotterill* for appellants.

*Mr. Robert L. Pierce,* with whom *Solicitor General Fahy, Assistant Attorney General Berge,* and *Messrs. Walter J. Cummings, Jr., Daniel W. Knowlton,* and *Nelson Thomas* were on the brief, for appellees.

*Messrs. Luther M. Walter, Nuel D. Belnap,* and *John S. Burchmore* submitted for the National Industrial Traffic League, intervener, urging affirmance.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

Appellants are motor carrier associations who seek to put into effect proposed rate schedules in order to meet

rail competition. The schedules cover transportation of hard surface floor covering, e. g., linoleum, from points in New England and Middle Atlantic states to various destinations in Middle Western states. The Interstate Commerce Commission, three Commissioners dissenting, rejected the schedules. 34 M. C. C. 641. In so doing it upheld the previous conclusion of its Division 3. 31 M. C. C. 193. A three-judge District Court (28 U. S. C. § 47) sustained the Commission's decision. 48 F. Supp. 432. The appeal, under 28 U. S. C. §§ 47a, 345, brings the decree here for review. Eastern-Central is the principal appellant. We think the judgment must be reversed.

When the schedules were filed, the motor carriers' rates on carpeting generally were based on minimum weights varying between 16,000 and 20,000 pounds, roughly approximating a truckload. Below this weight the rate was equivalent to 70 per cent of first class. Above it the rate varied somewhat, in the neighborhood of 45 to 50 per cent of first class. Corresponding rail rates then were 70 per cent of first class for shipments of less than 30,000 pounds (less than carload lots) and 45 per cent for larger shipments. Thus, the differential according to weight was geared in the one case to rail carload capacity and in the other to truckload capacity.[1]

Conceiving that these structures gave the railroads an undue competitive advantage on larger shipments, appellants proposed specific rates designed to enable them to

---

[1] So it was found, in each instance, upon the evidence, and the finding is not disputed. The figures are only approximate; that is, 30,000 pounds represents not an exact carload capacity, since differences in loading characteristics of commodities and slight differences in carload capacities, may make possible loading slightly more or less in a car. Similar, perhaps somewhat wider, variations affect trucks. The findings were that 20,000 pounds reasonably can be viewed as a minimum weight geared to truckload capacity, though in some instances as much as 22,000 or 25,000 pounds actually can be loaded in one vehicle.

compete with the railroads for such shipments. They sought to utilize a new minimum weight. The rates tendered were approximately the equivalent of 70 per cent of first class for shipments of less than 20,000 pounds, 47.5 per cent for 20,000 to 30,000 pounds, and 45 per cent for 30,000 pounds or more. The schedules therefore substantially put rail and motor rates on the same plane for less than 20,000 and more than 30,000 pounds; but placed motor rates substantially lower than rail rates for shipments of 20,000 to 30,000 pounds.

Certain western rail carriers protested. Thereupon the proposed rates were made the subject of investigation and suspension proceedings. 49 U. S. C. § 316 (d), (g), 49 Stat. 558–560, 54 Stat. 924. Hearings were begun before Division 3. While they were pending appellants agreed to make applicable in connection with their proposed rate, minimum 30,000 pounds, a tariff provision that such shipments "must be received at and transported from the point of origin from one shipper in one day and on one bill of lading." [2] The rail protestants therefore presented no evidence and after the hearing withdrew their protest. While the proceedings were pending the rail carriers also reduced their rates minimum 30,000 pounds to 42.5 per cent of first class.

The hearings continued and appellants presented evidence which showed, among other things, that one motor carrier, Brady Transfer and Storage Company, of Fort Dodge, Iowa, had received "since these rates were suspended, four loads from the Western Trunk Line Territory, instead of 398, and three of those we haven't collected the charges on, because the rate was too high . . ." It appeared too that the eastbound movement consists largely of dairy products, requiring refrigeration. The

---

[2] Cf. Carpets and Carpeting from Official to Southern Territory, 237 I. C. C. 651; Peanut Butter from Montgomery, Ala., to Georgia, 22 M. C. C. 375.

bulk of the westbound movement is frozen or salted fish.

Division 3 made findings and conclusions first that, based upon the costs proven and comparison with motor carriers' rates on numerous commodities, the proposed rates 45 per cent were "just and reasonable provided the minimum that is applicable in connection therewith is reasonable." Accordingly it examined the reasons advanced in support of the proposed minimum of 30,000 pounds.

On this, it found in No. M–1445[3] that linoleum shipments which move by rail to the Ohio points generally are consigned to warehouses having rail sidings, while linoleum is tendered to the appellant motor carriers in quantities weighing from 18,000 pounds upward. It found also, and the finding is not questioned, that it is physically impossible to load 30,000 pounds of linoleum into a single unit of equipment operated by appellants. While some of it can transport 25,000 pounds, "the normal truckload of linoleum approximates 22,000 pounds." Rejecting appellants' contention based on Carpets and Carpeting from Official to Southern Territory, 237 I. C. C. 651, the Division stated:

"The Commission has found repeatedly that carload minimum weights should be established by rail carriers with reference to the loading capacity of their freight cars and has condemned minimum weights in excess of the loading possibilities of the rail equipment. The respondents [appellants here] have not presented to us a valid reason *from the point of view of economy in transportation or otherwise,* such as we have found to exist in connection with certain trainload movements,[4] why they

---

[3] Two proceedings, Investigation & Suspension Docket No. M–1216 and No. M–1445, were heard separately, but consolidated before the Division.

[4] E. g., Molasses from New Orleans, La., to Peoria and Pekin, Ill., 235 I. C. C. 485.

should be permitted to establish a minimum weight greater than is physically possible to load in the motor equipment usually used by them, and, in our opinion, no such reason exists. Strictly speaking, the proposed minimum weight of 30,000 pounds is not a truckload minimum weight but rather is a volume minimum weight, which necessitates the use of more than one unit of equipment to load and transport that quantity of linoleum. *We adopt as a policy,* the condemnation *as unreasonable* of a volume minimum weight, unless it is shown clearly that, as a result thereof, motor carriers can handle the traffic at the volume minimum weight at costs per 100 pounds which are less than the costs incurred at a reasonable truckload minimum weight." (Italics supplied.)

The Division then found that, on the record, a reasonable truckload minimum on linoleum is 20,000 pounds and there was no showing of operating economies which would result if the proposed rates were restricted to apply only when 30,000 pounds are tendered. It concluded that the proposed schedules "are just and reasonable and otherwise lawful except to the extent that they propose to establish a minimum of 30,000 pounds; that the proposed minimum of 30,000 pounds is unjust and unreasonable; and that a minimum of 20,000 pounds would be just and reasonable." The proposed schedules therefore, to the extent found not just and reasonable, were ordered cancelled "without prejudice to the establishment . . . of truckload rates on linoleum, minimum 20,000 pounds, which are not less than 45 percent of the corresponding first-class rates." 31 M. C. C. 193.

Thereafter oral argument was had before the full Commission. At this stage the National Industrial Traffic League intervened and supported the Division's position.[5]

---

[5] This intervenor did not appear in the District Court, not having notice of the proceedings there until after the argument there. The appearance here is by virtue of an order granting a motion to intervene.

The Commission affirmed the Division's findings "that the proposed rates 45 and 47.5 percent of first class are not unjust or unreasonable except to the extent that the proposed rates, 45 percent of first class, are subject to a minimum of 30,000 pounds." Both rates, it said, "are within the zone of reasonableness." But "the proposed rates, minimum 30,000 pounds, would give an unjust advantage to shippers of 30,000-pound lots and be unjustly discriminatory to shippers of 20,000-pound lots." Since at that time the tariffs disclosed appellants' rates were either 45 or 47.5 per cent of first class, minimum 20,000 pounds, no order for the future was made. The Commission, in concluding its discussion, said:

"We are mindful of the fact that we approved certain [motor carrier] rates subject to a minimum weight of 30,000 pounds on linoleum in *Carpets and Carpeting, Official to Southern Territory, supra.* However, our report therein expresses our doubt as to the propriety of establishing a minimum of 30,000 pounds in connection with the proposed column 45 basis because it would require more than one unit of equipment to transport 30,000 pounds. That report was issued over a year ago and now we are convinced that not only were our doubts as expressed therein well founded, *but that for the future we shall follow the policy announced in the prior report herein* with respect to minimum weights in excess of the loading capacity of the equipment customarily used by the motor carriers." (Italics supplied.)

The District Court, sustaining the Commission's findings and decision,[6] held that the extent to which competi-

---

[6] The decree dismissed appellants' bill to set aside and enjoin enforcement of the Commission's order of suspension. The court agreed that the proposed rate of 45 per cent, minimum 30,000 pounds, is "a mere adoption on a volume basis of rates for railroad carload lots," having "no relation to the business of the motor carriers," both because there was no showing of any saving in operating costs when

tion should be recognized in arriving at just rates is a matter, within reasonable limits, for the expert judgment of the Commission and that, in exercising its discretion, that body had met the requirements of § 216 (i) of the Motor Carrier Act.[7]  49 U. S. C. § 316 (i).

## I.

Notwithstanding the apparent difference between the Division and the full Commission, in the former's view that the proposed rate minimum 30,000 pounds is unreasonable and the latter's that it is both unreasonable and unduly discriminatory, the net effect is that the rate is unlawful, as a matter of policy which condemns all volume minimum rates unless it is clearly shown they will operate at costs per 100 pounds less than the costs incurred at reasonable loading capacity rates.

---

carrying more than 20,000 pounds and because there was none that a 45 to 47.5 rate, for anything beyond 20,000 pounds "would not enable them to maintain reasonable competition with the railroads."  As to the finding that rates of either 45 or 47.5 per cent, minimum 20,000 pounds, would not in themselves be unreasonable, the court said this "does not negative the finding of an unjust advantage to shippers of 30,000 pound lots in cases where shippers of 20,000 pound lots are not given the same treatment."

[7] The court found that the Commission had met the section's requirements "in that it has given 'due consideration . . . to the inherent advantages of transportation by such carriers, (and) . . . to the need, in the public interest, of adequate and efficient transportation service by such carriers at the lowest cost consistent with the furnishing of such service. . . .' "  No specific reference was made, however, to the over-all national transportation policy, or its requirements particularly in relation to the Commission's duty "to . . . foster sound economic conditions . . . among the several carriers; to encourage the establishment and maintenance of reasonable charges, . . . without . . . unfair or destructive competitive practices; . . . all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail. . . ."  Cf. note 13 *infra* and text.

Whether this policy is now intended to apply to all forms of transportation, rail, motor and water, without regard to competitive conditions affecting two or more of them, is not clear from the abbreviated reports made in this case. But their casting of the matter in terms of unqualified policy, dependent only upon proof of the required reduction in operating costs, gives both appearance and substance to the view this may be true, if not with respect to all carriers, then certainly with reference to motor carriers. If so the effect will be, as appellants urge, not to make reduction in costs merely one factor, nor indeed even the most important factor, in determining the reasonableness and discriminatory or contrary character of rates. It will be rather to make reduction in costs the exclusive criterion, eliminating all other considerations, including competitive conditions amounting to necessity. That is true, notwithstanding the Commission's report, immediately prior to stating its adoption of the policy announced by the Division, gave expression in an abstract way to a directly contrary principle, namely, "the extent to which competition between carriers may render discrimination and prejudice not unlawful must be decided upon the facts in each case."[8] The latter statement, taken

[8] The Commission long has recognized that "reference to and . . . consideration of all pertinent facts, circumstances, and conditions affecting the rate in effect at any particular time" are necessary. 20 I. C. C. 43. Included as pertinent have been such "facts, circumstances, and conditions" as the expense attributable to the character of the commodity, e. g., whether it is subject to special risks or requires special services, cf. *Interstate Commerce Commission* v. *Chicago Great Western Ry. Co.*, 209 U. S. 108; 113 I. C. C. 389; 87 I. C. C. 711, or its transportation character is affected by the manner of packing, 98 I. C. C. 166; the value of the service rendered and of the commodity, e. g., 83 I. C. C. 334; 100 I. C. C. 471; 102 I. C. C. 325; cf. *Interstate Commerce Commission* v. *Delaware, L. & W. R. Co.*, 64 F. 723 (C. C. N. D. N. Y.); the possibility of securing continuous business or ad-

literally, squarely contradicts the policy unless indeed the statement was intended to qualify it in situations not indicated or contained an implicit limitation from context that the only "facts in each case" which would be material are those which would prove a reduction in costs.

That the purpose was not to qualify the policy seems apparent, not only from the latter's unqualified formulation and adoption and from the failure to intimate in what types of situation the qualification might operate, but also from two other considerations. One is that the state-ment was followed immediately by the broad and conclu-sive declaration, in general terms, without supporting data or reasons, except as supplied by the policy itself, that "the competition between rail and motor carriers for linoleum traffic does not constitute such a dissimilarity in circumstances and conditions as to render legal the pro-posed discrimination." The statement was not limited to the particular competitive situation. In terms it applied to all between rail carriers and motor carriers. In short, the policy, and therefore the single factor that there was no evidence to show reduction in cost, was the sole criterion of decision. Other facts, including competitive disadvan-tage, became irrelevant. And the significance of the pol-

ditional tonnage, *Interstate Commerce Commission* v. *Baltimore & Ohio R. Co.*, 145 U. S. 263; peculiar needs or conditions affecting specific areas, 9 I. C. C. 318; 113 I. C. C. 389; 146 I. C. C. 419; cf. *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 197; rates on the same or similar commodities elsewhere, 113 I. C. C. 389; 122 I. C. C. 235; and the need to meet competition, either by the same or other type of carrier, *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 197; *Interstate Commerce Commission* v. *Alabama Midland Ry. Co.*, 168 U. S. 144; *Texas & Pacific Ry. Co.* v. *United States*, 289 U. S. 627; *United States* v. *Illinois Central R. Co.*, 263 U. S. 515; *Mississippi Valley Barge Line Co.* v. *United States*, 292 U. S. 282; *Barringer & Co.* v. *United States*, 319 U. S. 1. See also 142 I. C. C. 121; 235 I. C. C. 485; 235 I. C. C. 723; 237 I. C. C. 651.

icy's application becomes more manifest by virtue of the fact that the case, though presented and decided on its own record, was regarded and determined as a test case.[9] Finally, the Commission's review of its previous decisions, upon which appellants relied, shows, we think, that its purpose, in the case of motor carriers at any rate, is to adhere strictly to the policy and, in the manner made, may be taken to indicate that it contemplates no departure whatever. If so, the effect of the decision is not merely to adopt "a policy of administration," as the Commission and the intervenors before it assert; but is rather to adopt, as a rule of law, the principle that only upon a showing of reduction in operating costs may a volume minimum rate be found reasonable and not unduly discriminatory.

## II.

The Commission considered chiefly previous decisions in Carpets and Carpeting from Official to Southern Territory, *supra;* Molasses from New Orleans, La., to Peoria and Pekin, Ill., 235 I. C. C. 485; and Petroleum Rail Shippers' Assn. *v.* Alton and Southern R., 243 I. C. C. 589. In the *Molasses* case, notwithstanding the Commission's previous refusal to authorize rail volume rates for more than carload lots at less than carload rates, it approved a multiple car rate, minimum 1,800 tons, on molasses which was lower than the carload rate. The effect was to authorize a lower rate to a number of carloads tendered as a single shipment. The departure was made to enable the

---

[9] The brief of the National Industrial Traffic League, intervenor, points out that appellants and other carrier associations joined in a petition to the Commission for reargument and reconsideration of eleven cases previously decided by Divisions 2 and 3, including the one presently involved, I. and S. No. M–1216. The petition was rejected, since the petitioners were not parties of record to all the proceedings. But coincidentally the Commission reopened I. and S. No. M–1216, for oral argument.

rail carriers to meet water competition. However, there was a showing that in the circumstances a material saving in costs per 100 pounds would be made in transporting such multiple-car shipments. In the *Petroleum Shippers* case the Commission considered authorizing multiple-car rates on petroleum, but declined to do so upon finding that the record did not establish existence of a substantial cost saving in such shipments.

In the *Carpets and Carpeting* case the Commission approved certain rates subject to a minimum weight of 30,000 pounds on linoleum. In doing so, it said:

"We are not convinced that it would be reasonable for the motor carriers to establish a minimum of 30,000 pounds in connection with the postponed column 45 basis, because it would require more than one unit of equipment to transport 30,000 pounds. On this record, however, we are not prepared to say that the column 45 rates, minimum 30,000 pounds, where not lower than the corresponding proposed rail-water carload rates, would be unlawful, provided that a rule is made applicable in connection therewith to the effect that shipments of not less than 30,000 pounds actually will be received at and transported from the point of origin from one shipper in one day and on one bill of lading." 237 I. C. C. 651, 657–658.

And in Peanut Butter from Montgomery, Ala., to Georgia, 22 M. C. C. 375, Division 2, although declaring in one breath that motor carriers should not maintain volume rates subject to minimum weights greater than equipment generally available can transport, in the next noted that the national motor-freight classification is replete with such ratings, refused to condemn them and said that if they were restricted to apply only when tendered by one shipper, in one day and on one bill of lading, they would be "in consonance with Carpets and Carpeting from Official to Southern Territory, supra."

## III.

These cases disclose departures, though tentatively made, from the Commission's long-standing[10] policy in the same respect, adopted when its powers extended only to rail carriers. Influenced primarily by the desire to secure shipping advantages for the small shipper equal to those given the large one and thus to enforce the policy of the interstate commerce legislation against undue discrimination, the Commission at first declined to adopt wholesale rates.[11] The major departure was in allowing lower rates for carload lots than for less-than-carload shipments. This was justified by the difference in costs. Accordingly, the structure became fixed with this as the major and for long the only differential; and with it the principle that such a saving in operations alone justifies a differential. That policy received judicial approval[12] and remained controlling so long as the Commission had authority only over railroads.

But with the evolution of other forms of carriage, particularly motor carriage, and the Commission's acquisition of control over their rates and operations, a new situation arose. The Commission's task no longer was merely the regulation of a single form of transport, to secure reasonable and nondiscriminatory rates and service. It became, not merely the regulator, but to some extent the

[10] E. g., Paine Bros. & Co. *v.* Lehigh Valley R. Co., 7 I. C. C. 218; Anaconda Copper Mining Co. *v.* Chicago & Erie R. Co., 19 I. C. C. 592, 596; Rickards *v.* Atlantic Coast Line R. Co., 23 I. C. C. 239, 240; Woodward Bennett Co. *v.* San Pedro, L. A. & St. L. R. R., 29 I. C. C. 664, 665; J. W. Wells Lumber Co. *v.* Chicago, M. & St. P. Ry., 38 I. C. C. 464, 465; and compare Scofield *v.* Lake Shore & Michigan So. Ry. Co., 2 I. C. C. 90.

[11] See note 10 *supra.*

[12] Compare *Interstate Commerce Commission* v. *Delaware, L. & W. R. Co.,* 220 U. S. 235, 240–241.

coordinator of different modes of transportation. With the addition of motor and water carriage to its previous jurisdiction over rails, it was charged not only with seeing that the rates and services of each are reasonable and not unduly discriminatory, but that they are coordinated in accordance with the national transportation policy, as declared by the later legislation.[13] This, while intended to secure the lowest rates consistent with adequate and efficient service and to preserve within the limits of the policy the inherent advantages of each mode of transportation, at the same time was designed to eliminate destructive competition not only within each form but also between or among the different forms of carriage.

Necessarily the impact of these changes brought problems the Commission previously had not faced. Necessarily too the Commission in facing them, including those of adjustment among the various forms of transportation, called upon its previous experience in the railroad field for guidance to its judgment. But that experience could not apply fully to the other and different forms of carriage. Nor could it do so always when the interests of two or more

---

[13] Motor Carrier Act of 1935, 49 Stat. 543; Transportation Act of 1940, 54 Stat. 899.

That policy demands that all modes of transportation subject to the provisions of the Interstate Commerce Act be so regulated as, in the statute's language, to "recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and *foster sound economic conditions in transportation and among the several carriers;* to encourage the establishment and maintenance of reasonable charges for transportation services, *without* unjust discriminations, undue preferences or advantages, or unfair or *destructive competitive practices;* . . . all to the end of *developing, coordinating, and preserving a national transportation system by water, highway, and rail,* as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense." 54 Stat. 899. (Italics added.) Cf. *McLean Trucking Co.* v. *United States, ante,* p. 67.

were found in conflict. Each form of transportation presents, by reason of its peculiar operating conditions, its own problems for the function of rate making. And each, by virtue of competition with others, presents additional complications arising from the varied circumstances of their operation. Hence, in such situations, principles previously established for application within a single form of transportation cannot always be transplanted to control its relations with another or those of both with the public generally, without consequences unduly harmful to one or to the public interest.

Thus, in the problem presented by this case, application of the principle that volume minimum rates will be allowed only when geared to a capacity loading which makes possible a real saving in costs of operation, may be made within either the railroad area or the motor area without substantial disturbance or difficulty. Each has its unit of carriage or loading and that unit has a substantial relation to costs; hence, upon the long-established railroad principle, to reasonableness and the discriminatory or nondiscriminatory character of rates. But, as between rails and motors, the two units are different. And the two forms of carriage compete, unless the lower rates geared to the respective units are of a character that each forces the other form of carriage from the field. The junction of difference in available units, with rates geared to them, and the fact of competition or competitive possibility produces or may produce consequences neither the character of the unit nor the fact of competition, nor both together, could create in either form of service taken alone. In short, the very fact a rail carload is 30,000 pounds and a truckload 20,000, with rates respectively tied to these weights, may make a life-or-death difference in the competitive struggle, with consequences affecting not only the carriers but the public interest as well. And appellants'

argument that a 30,000-pound minimum is necessary to meet rail competition is at least consonant with the frequent recognition, both by the Commission and by this Court, that there are occasions when it is appropriate for the former to consider a carrier's need to meet other carriers' competition as a factor justifying what otherwise would be an unreasonable or an unduly discriminatory rate.[14]

But whether and to what extent competition may have destructive effect, or other consequences hurtful to the public interest, in a particular situation may depend not merely on the difference in sizes of units, but on other factors. Each form of carriage has some inherent advantages over the others, such as mobility, speed, normal volume capacity, etc. Purely legal restrictions, such as limitations upon tonnage placed on trucks by state laws, create like or contrary effects. Whether, in a particular situation, the mere difference in loading capacity or some other or others of the many important factors affecting competitive position will be controlling depends upon the character of, and the factors involved in, that situation. And this is as true of one form of transportation as of another when, but for rate structures geared solely to costs of operation, it comes within a competitive tangent.

## IV.

In such a situation, therefore, to tie rate differentials exclusively to minimum weights based on available unit size conceivably might allocate all shipments of that size to the form of transportation to which it appertains. Or, if the effect were less extensive, still it might impose conditions upon the competition unduly burdensome or not required by the competitive situation and the applicable statutory policies. Thus, appellants say the Commis-

---

[14] Cf. note 8 *supra.*

sion's ruling has such consequences in this case, namely, to force them to make the 45 per cent rate available on shipments between 20,000 and 30,000 pounds, thus placing the railroads at a disadvantage on such tonnages and compelling the motor carriers to reduce their rates on them below what the competition requires; or to compel them to forego an equality of rate with the railroads on shipments of 30,000 pounds and more by charging only the one rate of 47.5 per cent on all shipments of 20,000 pounds and more. From these alternatives it is charged the consequence is to force the truckers "out of that very large field of traffic" and allocate it to the railroads. Whether this is the effect or not, we have no means of knowing on this record. Nor can we tell, other than by sheer acceptance of the Commission's conclusion, in the form of its statement of the result and cryptic formulation of the policy on which it is rested, whether the proposed rates will give the motor carriers an undue competitive advantage as to shipments of 20,000 to 30,000 pounds, whether there will be discrimination in fact between classes of shippers, or whether though these things may result in the particular situation they will do so only by virtue of its peculiar features or by virtue of its conformity to conditions generally prevailing in regions competitive as between rail and motor carriers.

These, and other questions of like import, remain unanswered upon the record. The problem is novel. It is not free from complexity, as appears from the Commission's hesitant departures from, then its return to, the long-established railroad rule, in inter-carrier situations. Further, the matter is one of general importance. It affects not only shipments of linoleum, and motor carriers, but many kinds of shipment and all kinds of carriers within the Commission's jurisdiction. It may touch vitally the public interest. It involves, to some extent, the important task of reconciling previously established rail-

road policies with, or adapting them to, the requirements of the presently effective national transportation policy and its application to a coordinated transportation system. Upon a matter of such consequence and complexity, our function in review cannot be performed without further foundation than has been made.

We do not mean by this to imply that the result the Commission has reached would not be sustained if a sufficient basis were supplied in the record. We do not undertake to determine what result the Commission should reach. But we cannot say the one at which it has arrived has the sanction of law without further basis than we now have. This in itself requires reversal. Consequently we need not speak concerning appellants' other contentions, except insofar as the pertinence of some of them to the necessary further proceedings requires.

## V.

Appellants' broadest contention must be rejected at this stage. It is, in effect, that as a matter of law, in the particular circumstances competitive necessity becomes the controlling consideration, and costs of operation, that is the requirement that minimum volume rates be geared to loading capacity, become immaterial. That view must be rejected for the same reason as requires rejection, on this record and until further buttressed, of the Commission's converse view that costs exclusively control and competition becomes immaterial. Conceivably particular circumstances might make one or the other factor predominant and, in such a situation, the choice would be for the Commission to make, upon a proper weighing of the facts and opposing policies possibly applicable. Whether in any case this contention of appellants could be accepted may be doubtful. Certainly it should not be in advance of further action by the Commission and then only in circum-

stances which would justify it as being in the public interest so clearly that no other view would be tenable.

Appellants also say that as a matter of law there could be no unjust discrimination in the present circumstances, since they insist there is no showing, upon the facts, that different classes of shippers would be affected. On the contrary they assert that all shippers actually are in the same class and all are free to avail themselves of the alternative rates above 20,000 and 30,000 pounds, 47.5 per cent and 45 per cent, respectively, as they please. But the only bases for this assertion are, first, the absence of any finding that the availability of the 45 per cent rate, minimum 30,000 pounds, "would in practical effect be confined to only a few or a particular class of shippers" and the further assertion that no such finding could be made, since 30,000-pound shipments of linoleum "are the normal units of quantity purchase and sale as revealed by the railroad carload rates which apply between the same localities only on shipments of 30,000 pounds." Obviously, as the Commission noted, the mere existence of these rates in the tariffs hardly could be taken to prove the conclusion appellants sought to draw from that fact. Certainly it could not be taken as conclusive evidence. Whether or not, however, the proposed rates in fact would operate to create an undue discrimination between shippers, or classes of them, is a matter upon which the record factually throws no light. It is therefore one for further examination by the Commission.

In returning the case we emphasize that we do not question the Commission's authority to adopt and apply general policies appropriate to particular classes of cases, so long as they are consistent with the statutory standards which govern its action and are formulated not only after due consideration of the factors involved but with sufficient explication to enable the parties and ourselves to

understand, with a fair degree of assurance, why the Commission acts as it does.  Cf. *United States* v. *Carolina Freight Carriers Corp.*, 315 U. S. 475, 488, 489.  Observance of this requirement is as necessary when an established policy is being extended to new and significant situations as when a new policy is being formulated and applied in the first instance.  We do not undertake to tell the Commission what it should do in this case.  That is not our function.  We only require that, whatever result be reached, enough be put of record to enable us to perform the limited task which is ours.

The judgment is

*Reversed.*

Mr. Justice Frankfurter, with whom the Chief Justice and Mr. Justice Reed concur, dissenting:

This case in its essentials can be reduced to simple terms; in effect, the question is whether the Interstate Commerce Commission acted unlawfully in holding unreasonable and discriminatory a proposed schedule of rates for the shipment of linoleum in trucks operated by members of appellants, associations of motor carriers.  The facts are these.  On linoleum shipments between points in New England, New Jersey, Delaware, Pennsylvania, and New York, and destinations in Iowa, Kansas, Minnesota, Missouri, Nebraska, and South Dakota, the members of the Eastern Central Motor Carriers Association charged 50% of first-class rates, minimum 20,000 pounds.[1]  This minimum is approximately the weight which conventionally is a truckload.  Railroad rates on linoleum at this time were 70% of first-class for shipments of less than 30,000 pounds and 45% of first-class for those

[1] "First-class" is used to designate the rates applied to a class of commodities.  Percentages of a class rate are used as rates for designated commodities.

weighing at least 30,000 pounds—a conventional railroad carload.

By schedules filed to become effective August 24th, 1940, Eastern proposed rates of 47.5% of first-class, minimum 20,000 pounds, and 45% of first-class, minimum 30,000 pounds. The practical effect of this change would be to require a shipper who could send only 20,000 pounds of linoleum to pay a higher rate than one who could ship a consignment of 20,000 and 10,000 pounds. And two shippers, one with 10,000 pounds and the other with 20,000 pounds could combine their shipments at the lower rate, while a shipper of 10,000 pounds who could not conveniently join with others would have to pay the higher rate. These are the changes here in controversy. Upon the protest of the western trunk line rail carriers, later withdrawn when the appellants agreed that their 30,000 pound minimum rate would apply only on shipments "received at and transported from the point of origin, from one shipper in one day and on one bill of lading," operation of the proposed schedules was suspended and Division 3 of the Commission held hearings to determine their validity. Upon their conclusion, Division 3 found that the proposed rates were reasonably compensatory, but that it was physically impossible to load 30,000 pounds of linoleum into a single unit of equipment, and that there was no showing that operating economies result when a 30,000 pound minimum shipment involving a truckload and fraction of another truckload is tendered. The Division thereupon concluded that a minimum weight greater than a truckload is unreasonable unless such a rate is justified by savings in cost, and ordered the proposed schedules cancelled to the extent found unjust and unreasonable. 31 M. C. C. 193.

This decision was fully reviewed by the entire Commission upon oral and printed arguments by the motor car-

riers, the linoleum shippers, and the National Industrial Traffic League, a group organized to promote the free interchange of commerce. The shippers and the Traffic League urged the Commission to leave the order of Division 3 undisturbed, while the motor carriers sought to justify the rates as legitimate means of meeting rail competition. The Commission agreed with Division 3 that the rates were unreasonable and held that the 30,000 pound minimum, based on no difference in transportation cost, would be discriminatory. 34 M. C. C. 641.

If the sole issue were whether there would be discrimination in favor of the 30,000 pound lot shipper as against the 20,000 pound lot shipper, clearly the Commission could find as it did, and the court below properly did not undo what the Commission did. 48 F. Supp. 432. Is there in fact more? The appellants contend that rail competition excuses and legalizes the discrimination beyond the Commission's power to condemn. This Court does not yield to that claim, but it does hold that either the Commission must state with particularity why the evidence of competitive conditions in this record is so vague and inadequate as to afford no justification for discrimination, or, in effect, requires the Commission to proceed with a full-dress investigation of the entire competitive relations between motor and rail carriers.

The Commission, on the basis of the evidence before it, concluded that "The competition between rail and motor carriers for linoleum traffic does not constitute such a dissimilarity in circumstances and conditions as to render legal the proposed discrimination." Prior decisions of this Court surely do not require greater explication of the reasons on which the Commission's conclusions are based. See *Beaumont, S. L. & W. Ry. Co.* v. *United States,* 282 U. S. 74, 86–87; *United States* v. *B. & O. R. Co.,* 293 U. S. 454, 464–465. The Commission did not adopt an inflexible "principle that volume minimum rates

will be allowed only when geared to a capacity loading which makes possible a real saving in costs of operation," if its statement that "The extent to which competition between carriers may render discrimination and prejudice not unlawful must be decided upon the facts in each case" is to be accepted. Burke has said somewhere that he could not imagine English law without the law reports. Substantially the same considerations that call for giving reasons in rendering judicial decisions apply to the determinations of such agencies as the Interstate Commerce Commission. "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." See *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 511. But we should not be more exacting of reports of the Interstate Commerce Commission explaining its orders than we are of the opinions of lower courts whose judgments come before us for review.

Nothing in this record calls for more explicitness than is ordinarily demanded. For nothing in the record requires the Commission to discuss the conceivable validity of proposed schedules which, aside from competitive conditions, are manifestly discriminatory. Such discriminatory rates were supported by a bare recital that railroad rates were nominally lower than motor carrier rates and that the business of one motor carrier had decreased. At the hearing before the Division, a representative of one motor carrier stated that the proposed rates were more than adequate to cover costs, that they did not vary substantially from rates imposed on the shipment of other comparable commodities, and that railroad competition had caused his company's linoleum business to decline. He also testified that his firm competed for linoleum shipments with other motor carriers. This is the proposed justification for a rate differential concededly based on no difference in transportation cost or in service rendered and which therefore discriminates between those who ship 30,000 pound lots and

those who ship 20,000 pound lots. And the record becomes even more barren when it is noted that the competitive conditions said to require adoption of the proposed discriminatory tariffs were not such as to prevent the rail carriers' acquiescence in the adoption of the new schedule when, on appellants' theory, the rail carriers had advantages intended to be mitigated by the new rates. The Commission found that either 47.5% or 45% was an allowable rate for either a 30,000 or 20,000 pound shipment—either rate "was within the zone of reasonableness." It thereby permitted the motor carriers to compete on an entire equality with the rail carriers. But it forbade discrimination as between linoleum shippers equally placed. What the appellants really complain of is not that they cannot meet the railroad competition at the 45% rate on 30,000 pound lots, but that they cannot do so and yet collect 47.5% on lots of 20,000 pounds which are outside rail competition. Be that as it may, a mere arithmetic difference between railroad rates and motor carrier rates is quite blind. The rates themselves may not be at all revealing on competitive conditions; they may not tell what a shipper gets for his money and what he is paying for. That is, the quality of the service, the advantages of one type of service over the other, the availability of equipment, safety, labor cost, and many other factors may all give significance to the figures that figures themselves do not give.

The present ruling apparently imposes upon the Commission the duty of pursuing such complicated and far-reaching investigations every time a motor carrier rate that may have a relation to a railroad rate is found to be discriminatory in relation to another motor carrier rate affecting the same commodity. Such an investigation is an undertaking of vast scope involving consideration of factors which it would require an expert merely to catalogue. The different characteristics of rail and motor carrier serv-

ices, the economic wisdom of excluding motor carriers from large-bulk linoleum trade or limiting their participation in such trade, the availability of other commodity shipments to replace linoleum trade diverted to rail carriers, the availability of and cost of transporting commodities which might be used to fill the truck only partially loaded with linoleum—these are only a few of the factors which may become relevant. Compare III–B Sharfman, *The Interstate Commerce Commission,* pp. 572 *et seq.* The appellants introduced no evidence on the basis of which the Commission could intelligently weigh these considerations. To hold that the Commission must on its own initiative embark on such an investigation in a proceeding of this nature is to impose what may well be a crippling burden.

To speak more particularly of the task which the Commission now faces, it should be noted that Eastern files tariffs with the Commission for about 650 carrier members. A typical commodities clause from the carriers' certificates of public convenience and necessity provides for the shipment of *"General commodities,* except those of unusual value, and except dangerous explosives, household goods as defined in Practices of Motor Common Carriers of Household Goods, 17 M. C. C. 467, commodities in bulk, commodities requiring special equipment, and those injurious or contaminating to other lading, over regular routes . . ." Thus it appears that the exceptions are few and the allowable shipments many. An investigation of the scope apparently required by the Court would entail a detailed study of the relations of the rate structures in a case merely involving the rates on specific commodities one to the other. If rail competition turns out to be actually detrimental to the successful operation of appellants' linoleum business, the war-time load on the railroads might become relevant, and the Commission might have to decide whether the atypical circumstances at this time

justify competitive discriminatory rates which might otherwise be unreasonable.

That the Commission is an expert body to which Congress has seen fit to commit the regulation of the intricate relationships between the various means of national transportation is a well-worn phrase which ought not to lose its significance in practice when the actions of the Commission come here for review. We should be very reluctant to define for the Commission the occasions which appropriately demand investigation of general transportation problems, and more particularly when a contest over the rate on a particular commodity included in a network of tariffs calls for such a general investigation. Surely it is within the special competence of the Commission to put on a discriminating carrier the duty of justifying by proof his plain discrimination as to a particular rate and not permit him to compel the Commission by a mere assertion to embark upon a far-flung inquiry. There are undoubtedly occasions when the Interstate Commerce Commission will undertake such an investigation in the public interest. But it ought not to be compelled to do so upon the occurrence, from an administrative point of view, of a more or less accidental filing of a tariff revision. When the carrier seeks to supplant a lawful rate, as is the case here, the burden is on it to supply all the essential information to justify the proposed new rate. § 216 (g), Part II of the Interstate Commerce Act, 49 U. S. C. § 316 (g). If it does not do so, it has failed to sustain the duty cast upon it by law, and the Commission in so finding has duly exercised its authority. The Commission's dispositions of Molasses from New Orleans, La., to Peoria and Pekin, Ill., 235 I. C. C. 985 and Petroleum Rail Shippers' Assn. v. Alton & Southern R., 243 I. C. C. 589, are entirely consistent, so far as that is relevant, with its order in this case.