**HUDSON BUS TRANSP. CO., Inc. v. UNITED STATES et al.**

**ASBURY PARK–NEW YORK TRANSIT CORPORATION et al. v. UNITED STATES et al.**

Civ. Nos. 11566, 11460.

United States District Court
D. New Jersey.

May 24, 1950.

Messano & Messano, Jersey City, N. J., Louis J. Messano, Jersey City, N. J., and S. S. Eisen, New York City, of counsel, for plaintiff Hudson Bus Transp. Co., Inc.

Edward W. Currie, Matawan, N. J., for plaintiffs Asbury Park–New York Transit Corporation, Coastal Cities Coach Co. and Rollo Transit Corporation.

Isaiah Matlack, United States Attorney, Newark, N. J., William D. McFarlane, Sp. Asst. to Atty. Gen., Herbert A. Bergson, Asst. Atty. Gen., for defendant United States.

Daniel H. Kunkel, Edward M. Reidy, Asst. Chief Counsel, Washington, D. C., for defendant Interstate Commerce Commission, Daniel W. Knowlton, Chief Counsel, Washington, D. C., of counsel.

Roberts, Pillsbury, Carton & Sorenson, Atlantic Highlands, N. J., John M. Pillsbury, Atlantic Highlands, N. J., Wilmer A. Hill, Washington, D. C., of counsel, for defendant Keansburg Steamboat Co.

Before KALODNER, Circuit Judge, and SMITH and MADDEN, District Judges.

MADDEN, District Judge.

Plaintiffs each sue to enjoin, set aside, annul and suspend certain portions of an order of the Interstate Commerce Commission granting to Keansburg Steamboat Company, hereinafter called applicant, a certificate of public convenience and necessity to operate two different types of service as a common carrier by motor vehicle of passengers and their baggage over certain prescribed routes between New York, New York and Long Branch, New Jersey, also servicing certain intermediate points.

Since 1910 applicant had been running vessels between New York City and Keansburg, New Jersey. Under the Commissions' decision herein, travellers on these vessels would be carried by steamboat from the Battery in New York City to Keansburg, New Jersey, and there transferred to its proposed bus line and carried by busses to Long Branch, New Jersey, and certain intermediate points. This would be a co-ordinated boat-bus service and permission was for an all year round authority but operation would be seasonal most likely from May or early June to late September or October.

The other service granted to applicant is a direct all bus line service from midtown New York City through the Lincoln Tunnel, thence over various highways to Keansburg, New Jersey and thence to Long Branch, serving Keansburg and Long Branch, and the communities between those two points. This direct all bus service would be an all year round operation.

Before discussing the matter it might be well to describe the locality involved. On the south shore of Raritan Bay the New Jersey shore line runs almost east and west. At the easterly end a peninsula like shore protrudes northwardly between Raritan Bay and the Atlantic Ocean, and is Sandy Hook. The mainland's shore turns at almost right angles at this point and runs generally north and south and is washed on the east by the Atlantic Ocean. The town at the corner so made is Highlands. The east-west portion is about 15 miles long with the municipality of Keyport at the westerly end and Highlands at the easterly end. The distance southerly from Highlands to Long Branch is approximately 6 miles. Keansburg (where the pier of applicant is located) is on the south shore of Raritan Bay or as hereinbefore described, is a part of the east-west shore line and lies about 5 miles easterly from Keyport and 10 miles westerly from Highlands.

The application for the certificate of convenience and necessity was filed September 4, 1945, and was referred to a joint board pursuant to section 205 of the Interstate Commerce Act, as amended, 49 U.S.C.A. § 305, composed of representatives of the Utility Boards of New York and New Jersey.

Hearings were conducted by the joint board with an Interstate Commerce Commission Examiner present on June 5, 6, 7, 10, 12, 13 and 14, 1946, during which 1,349 pages of testimony was recorded. The plaintiffs were present, together with others, notably the Pennsylvania Railroad and The Central Railroad of New Jersey, and participated in such hearings together with certain intervenors.

The joint board recommended that the application be granted to the following extent; that upon the coordinated boat-bus service that applicant's busses be permitted to pick up passengers at its pier in Keansburg and serve a named route between the pier and its terminal in Long Branch; that upon the direct all bus service from New York to Long Branch it must maintain closed doors until its pier in Keansburg was reached and then could serve between the pier and its terminal in Long Branch.

The joint board found that there was no need for the proposed service in the towns of Keyport (which is located at the westerly end of the aforementioned 15 mile east-west shore) and Union Beach which adjoins Keyport and is easterly thereof, and recommended that this portion of the application be denied.

Exceptions were taken to this report and referred to Division 5 of the Commission, which, on February 16, 1948, filed its report herein under attack.

The decision of Division 5 differed only in one respect from the recommendations of the joint board. Division 5 found that public convenience and necessity required that applicant should be permitted to serve all of Keansburg and did not restrict applicant's service to that portion of its route between the pier and Long Branch.

The plaintiffs herein applied to the Interstate Commerce Commission for a reopening of the matter and a further hearing, and such application was refused.

The present suits were instituted in this court, the first No. 11460 by the Hudson Bus Transportation Co., Inc., hereinafter called Hudson, on July 1, 1948, and the other by Asbury Park-New York Transit Corp., Coastal Cities Coach Company, and Rollo Transit Corp., hereinafter jointly referred to as Asbury-Coastal, on August 2, 1948. By order properly entered on October 11, 1948 the two matters were consolidated for trial.

Plaintiffs in each instance seek to enjoin, set aside, annul and suspend certain portions of the order of the Commission.

Hudson's attack upon the Commission's decision is against the grant to applicant the right to serve Keansburg which is the terminus of a presently existing bus line by Hudson between New York City and Keansburg.

Asbury-Coastal's attack is against the grant to applicant to serve Long Branch which is the terminus of a presently existing bus line by Asbury Park-New York Transit Corp., together with other intermediate points which are not on Asbury Park-New York Transit Corporation's route, together with attack by Coastal and Rollo its subsidiaries upon the grant to applicant to serve intermediate points between Keansburg and Long Branch served by either of them in intrastate carriage.

It might be well to point out at this juncture the three grounds upon which, generally speaking, a reviewing court, as here, may inquire into the action or ruling of the Interstate Commerce Commission are:

1. Did the Commission have authority in the law for its actions? This is elementary.

2. Was there substantial evidence to support the action of the Commission or to the contrary was its action arbitrary and capricious? See U. S. v. Chicago Heights Trucking Co., 310 U.S. 344, 352, 60 S.Ct. 931, 84 L.Ed. 1243; The Los Angeles Switching case (Interstate Commerce Commission v. Atchison, T. & S. F. R. Co.,) 234 U.S. 294, 34 S.Ct. 814, 58 L.Ed. 1319; Board of Trade of Kansas City et al. v. U. S. et al., 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432; U. S. v. Pierce Auto Freight Lines, Inc., et al., 327 U.S. 515–535, 66 S.Ct. 687, 90 L.Ed. 821.

3. Has the Commission in its findings and judgment made sufficient explication to enable the parties and a reviewing court to understand with a fair degree of assurance why the Commission acted as it did? See Eastern Central Carriers Association v. United States, 321 U.S. 194, 64 S.Ct. 499, 88 L.Ed. 668; Fine and Jackson Trucking Corp. v. United States et al., D.C., 65 F. Supp., 443 and 444.

It appears to the court that there is no attack by the plaintiffs upon the legal authority of the Commission to do what it did, but the points of attack upon the Commission's action can be grouped under the two general grounds: (a) Was there substantial evidence before the Commission? (b) Did the Commission make sufficient explication? (c) The additional point as urged by Hudson "the plaintiff was not accorded a full and fair hearing with respect to the existing service provided to and from Keansburg, New Jersey."

Before discussing the two main points, it might be well to dispose of plaintiffs' contention that they were not accorded a full and fair hearing with respect to the existing service provided to and from Keansburg, as urged in Hudson's point 7.

This is bottomed upon the Commission's refusal to grant a rehearing to an application filed by Hudson on March 8, 1948, and by Asbury-Coastal on April 5, 1948, so that they might show the actual schedules of Hudson between Keansburg and New York, during the winter seasons of 1946–47 and 1947–48.

The Commission was, in the opinion of the court fully cognizant of the situation

and was entitled to draw its own conclusions as what caused an increase of service on the part of Hudson after the application of Keansburg Steamboat Company was filed and heard by the joint board.

▮ The matter of a rehearing was strictly a matter of discretion with the administrative body, the Interstate Commerce Commission, and not for a reviewing court. See Interstate Commerce Commission v. Jersey City, 322 U.S. 503, and the cases cited by Mr. Justice Jackson on pages 515, 516, 517 and 518, 64 S.Ct. 1129, on pages 1135, 1136, 88 L.Ed. 1420.

The action of the Commission in refusing rehearing was not, in the opinion of this court, an abuse of the discretion that lies with that body, so that this point is without substance.

We turn next to the two questions, (1) was there sufficient evidence, and (2) was there sufficient explication?

An examination of the record discloses that the hearings before the joint board (except on one day when the examiner sat alone) consumed seven days and constituted 1,349 pages of testimony and exhibits. One particular day (June 7, 1946) the board sat from 9:30 a. m. to 5:30 p. m. and resumed at 7:30 p. m. and continued to 10:00 p. m.

Summarizing the witnesses, the applicant had four; intervenors in behalf of the application produced forty-one who testified, and dismissed twenty-five more because their testimony was cumulative. Protestants and intervenors against the application, including the Central Railroad of New Jersey (not now in this proceeding) had approximately seventeen witnesses, eleven of whom might be classed public witnesses; the remaining witnesses being professional ones or associated with the protestants in some manner.

Of the eleven public witnesses, four came from Keyport, one came from Union Beach (these two municipalities are not involved in the present controversy) and six from Keansburg. Added to this testimony were the resolutions of the governing bodies of the ten municipalities involved in support of the application with no resolutions offered in evidence against.

▮ While there can be no presumption that the Commission disregarded the public or any other interest, U. S. v. Pierce Auto Freight Lines, Inc., supra, 327 U.S. at page 532, 66 S.Ct. 687, 90 L.Ed. 821, nevertheless, the Commission, upon the record made before it, was well apprised of the transportation problem of the area involved. Nor could it have been oblivious to the competitive consequences of the application if granted. Moreover, although the weight and credit to attach to the evidence are, naturally, for the Commission to resolve, were we empowered to do so, we should be moved to conclude that the very full record of the diverse interests lends itself completely to the finding of public necessity and convenience.

But this is not our function. Ours is extremely limited. See Interstate Commerce Commission v. Mechling, 330 U.S. 567-574, 67 S.Ct. 894, 91 L.Ed. 1102. And as was stated by Mr. Justice Black in United States v. Chicago Heights Trucking Co., supra, 310 U.S. at page 352, 60 S.Ct. at page 935, 84 L.Ed. 1243: " 'It is not disputable that from the beginning the very purpose for which the Commission was created was to bring into existence a body which, from its peculiar character, would be most fitted to primarily decide whether from facts, disputed or undisputed, in a given case, preference or discrimination existed.' And where a court substituted 'its judgment as to the existence of preference for that of the Commission, on the ground that where there was no dispute as to the facts it had a right to do so, (the court) obviously exerted an authority not conferred upon it by the statute.' "

And as was said by Mr. Justice Rutledge in United States et al. v. Pierce Auto Freight Lines, Inc., et al., supra, 327 U.S. at page 535, 66 S.Ct. at page 698, 90 L.Ed. 821: "We think the court misconceived not only the effects of the Commission's action in these cases but also its own function. It is not true, as the opinion stated, that '* * * the courts must in a litigated case, be the arbitors of the paramount pub-

lic interest.' This is rather the business of the Commission, made such by the very terms of the statute. The function of the reviewing court is much more restricted. It is limited to ascertaining whether there is warrant in the law and the facts for what the Commission has done."

Plaintiffs also argue that the Commission did not evaluate the testimony properly in that they did not find that the service applied for could not be supplied by the objectors below, plaintiffs here, and to allow the application would be against public policy and would create what possibly could be ruinous competition. This likewise is a function for the Commission's determination and was likewise disposed of in the United States v. Pierce case, supra, by Mr. Justice Rutledge, 327 U.S. at page 530, 66 S.Ct. at page 695, 90 L.Ed. 821, when he said:

"They urge that it was not sufficient for the Commission to find, as it did on adequate evidence, that the existing service between Portland and San Francisco was inadequate; and to conclude, as the report expressly stated, that in view of this fact, among others, 'public convenience and necessity require the operations set forth in our findings herein.' This statement was additional to the explicit conclusion already noted that the situation presented by the applications was one which required either granting both or denying both. And the findings expressly stated, concerning each application, that the 'present and future public convenience and necessity require the extended operations.'

"Only the most hypercritical reading of the findings, and one which ignores the report's explicit statements in many respects, could construe them as meaning only that each operation was required by public convenience and necessity without any regard to the competitive consequences of granting both. The Commission should not be required to rewrite its report simply to say, redundantly we think, that both operations, as well as each, are required by public convenience and necessity."

■ So that this court holds that there was substantial evidence before the Com-

mission to warrant the Commission's action and that it was properly evaluated.

■ We come now to the question of explication. Does the report contain the necessary basic findings, and does it make sufficient explication? To determine this requires a study of the report itself, but in passing it seems that in all of these cases one must not only study the report but must also set forth large portions of the report verbatim in order to substantiate the writer's opinion, be it either pro or con.

The report has this preface: "Exceptions were filed by certain intervenors to the order recommended by the joint board and applicant and certain intervenors in support of the application replied. Our conclusions differ slightly from those recommended."

The report then explains the application (sheet 1, par. 2). It describes the geography of the area to be served (sheet 2, par. 3). It describes the routes sought (sheet 2, par. 4). It describes the present service and facilities of applicant (sheet 3, par. 2). It describes the applicant's proposal (sheet 3, par. 3). It describes the types of communities involved and their varying populations (sheet 3, par. 4; sheet 4, par. 1 and par. 2). It describes the present service of protestants and intervenors (sheet 4, par. 3 and pars. 4 and 5, and all of sheet 5), and summarized this (sheet 6, par. 2).

It then reviews the evidence in support of the application (sheet 6, par. 3 and pars. 4 and 5; sheet 7, pars. 1, 2, 3, and 4), and reviews the evidence in opposition to application (sheet 7, par. 5 and sheet 8, pars. 1, 2, and 3). It then discusses the matter and makes its conclusions (one-half of sheet 8; all of sheet 9 and one-half of sheet 10).

Whether it contains sufficient explication can be ascertained only by quoting pertinent parts thereof:

"Sheet 3, paragraph 2: For many years, applicant has been engaged in the seasonal (May to September or October) transportation of passengers by water between the foot of Battery Place, Manhattan, New York City, and its pier at Keansburg, and also in excursion and chartered-vessel service. Two steamboats, with capacities of

2,036 and 1,699 passengers, are employed in these operations, and applicant is planning construction of a new boat at a cost of between $300,000 and $400,000.

"Sheet 5, paragraph 1, line 4: Its (Hudson) service over this route was suspended during the war under regulations of the office of Defense Transportation and was resumed by it on November 12, 1945. During the fall-to-spring season of 1945–1946, it operated only two schedules daily between Keansburg and New York City, but its representative announces an intention to operate eight round trips daily during the next winter season.

"Sheet 5, paragraph 2, line 10: (Speaking of Asbury's service) With the exception of New York City and Long Branch, no points are served which applicant proposes to serve. Their (Asbury's) Long Branch terminal is about 1,000 feet from the location which applicant proposes to utilize as a terminal. These carriers operate eight New York City–Long Branch schedules each way daily, and they reserve seats for passengers upon request.

"Sheet 6, paragraph 2: Summarizing briefly the present service, described above, it will be noted that Keyport now enjoys the service of Asbury-Coastal and Hudson, as well as the rail service of Central; that Union Beach is served by Hudson and Central and is within 1½ miles of the terminal of Asbury-Coastal at Keyport with convenient and frequent local transportation of Rollo between Union Beach and Keyport; and that Keansburg, in addition to applicant's steamboat service, is served by Hudson which operates through the center of the community, and by Central and Rollo. Points on applicant's proposed routes between Keansburg and Highlands are served by Central but there is no through bus service from such points to New York City. By using the service of Rollo or Boro Busses, which operate under intrastate authority, persons may travel to Keansburg and use Hudson's service from there, or they may travel to Red Bank or another point on the route of Asbury–Coastal and use the latter's route to New York City. Points on the proposed route between Highlands and Long Branch are served only by Boro Busses. Long Branch is served by Asbury–Coastal as well as by Central and Pennsylvania.

"Sheet 7, paragraph 3: Those supporting the application include the mayor, secretary of the chamber of commerce, a hotel proprietor, and two other residents of Long Branch, the borough manager and five other business men and residents of Keansburg, and persons holding public office or having business connections or residence at Keyport, Union Beach, West Keansburg, Port Monmouth, Belford, Atlantic Highlands, Highlands, Monmouth Beach, New Monmouth, and Sea Bright.

"Sheet 7, paragraph 4, line 11: As stated applicant will operate from a point in Midtown Manhattan and through the Lincoln Tunnel, and it will not meet the requirements of those who want downtown service. But on the other hand considerable support is accorded the application because it will use a midtown terminal. *As a whole, a strong desire for motor carrier service which does not exist at present is established.*

"Sheet 7, paragraph 5: Public evidence in opposition: In addition to establishing present service and other pertinent data relating to conditions affecting this service and the communities which applicant would serve, six residents of Keansburg, four of Keyport, and one of Union Beach appeared in opposition to the application and established that their motor-carrier transportation requirements had been met fully by Hudson or by Asbury–Coastal and its affiliate Rollo. Intervenors in support of the application as well as those in opposition had a number of witnesses in the hearing room who were not heard, but in each case, they were expected to support or oppose the application for reasons the same as advanced by those who appeared.

"Sheet 8, paragraph 4: Discussions and conclusions: Keyport is served by Central, by Hudson and by Asbury-Coastal. Union Beach is adjacent to Keyport and is served by Hudson and by Central. We concur in the conclusion of the joint board that the present service at these points is adequate.

"Sheet 8, paragraph 6: We have repeatedly adhered to the view that the public is

entitled to efficient motor-carrier, as well as rail transportation. There appears little if any reason to doubt that applicant's service is required at intermediate points on the proposed routes between Long Branch and Keansburg.

"Sheet 9, paragraph 2, line 11: However, applicant's proposed service from and to Long Branch undoubtedly will be attractive to passengers who use applicant's water transportation to Keansburg. We are convinced that applicant may be permitted to serve Long Branch as a terminal without any noticeable adverse effect on other carriers which serve that point.

"Sheet 9, paragraph 3: The only other question is whether applicant should be permitted to serve Keansburg. The joint board concluded that it should be permitted to pick up and discharge passengers in Keansburg, only on that part of its routes which are between its pier there and Long Branch. One such route (route 4) passes through the center of the community. Hudson serves Keansburg, but during the last winter season, it operated only two schedules daily in each direction between Keansburg and New York. Applicant has a pier and other facilities there and has served Keansburg by water over a number of years. The development of the community, at least to some extent, is related to this long service. Such a logical improvement in the service as that proposed should be permitted. *We conclude that applicant should be permitted to serve all points in Keansburg. Applicant is fit and able to perform the service hereinafter authorized.*

"Sheet 9, paragraph 4: *We find that present and future public convenience and necessity require operation by applicant, in interstate or foreign commerce as a common carrier by motor vehicle of passengers and their baggage* (1) from New York, N. Y., etc., describing route, and concluding; that applicant is fit, willing and able properly to perform such service and to conform to the requirements of the act and to our rules and regulations thereunder; that an appropriate certificate authorizing such operations should be granted; and that the

application in all other respects should be denied." (Emphasis supplied.)

The court feels that there is one thing that is significantly illustrative of plaintiffs' complaint against the report. Where the report said (sheet 8, par. 4), "Keyport is served by Central, by Hudson, and by Asbury-Coastal. Union Beach is adjacent to Keyport and is served by Hudson and by Central. We concur in the conclusion of the joint board that the present service at these points is adequate", evokes no criticism from plaintiffs, but where the report in paragraphs and paragraphs gave conclusions and reasons for granting the other portions of the application, the plaintiffs complain that there is not sufficient explanation.

Examination of this court's records leads to the case of Inter-City Transportation Co. v. U. S., D.C., 89 F.Supp. 441, 444, opinion by Circuit Judge McLaughlin, April 13, 1948. The report under consideration in that case and the report presently under consideration are strikingly similar. In that case Judge McLaughlin had this to say of the report under consideration: "On that comprehensive report, as a matter of common justice to the Commission, we must hold that its decision makes sense. Based on a sound foundation of evidence, the Commission concluded that it was doing a progressive, good thing in giving the territory in question the transportation sought; in giving that territory service needed now and for the future. While another fact finding tribunal might possibly arrive at a different conclusion from the facts, the Commission's decision is at least readily understandable."

Does the report presently under consideration meet the same test as the one quoted by Mr. Justice Rutledge in Eastern Central Carriers Association v. United States, supra, 321 U.S. at page 211, 64 S.Ct. at page 508, 88 L.Ed. 668:

"But with sufficient explication to enable the parties and ourselves to understand, with a fair degree of assurance, why the Commission acts as it does."
And 321 U.S. at page 212, 64 S.Ct. at page 508, 88 L.Ed. 668:

"We only require that, whatever result be reached, enough be put of record to enable us to perform the limited task which is ours."

And that established by Mr. Justice Cardozo in Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282 to 287, 54 S. Ct. 692, 694, 78 L.Ed. 1260: "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body. In this instance the care and patience with which the Commission fulfilled its appointed task are plain, even to the casual reader, upon the face of its report."

We think that the report does meet these tests and consequently for the reasons stated herein the bills of complaint will be dismissed.