## ATLANTA & SAINT ANDREWS BAY RY. CO.[1] v. UNITED STATES.[2]

### No. 354–S.

United States District Court,
M. D. Alabama, S. D.

April 10, 1952.

1. & 2. There are numerous intervening plaintiffs and defendants which appear in the record, but for the sake of brevity are not here named.

194

James N. Frazer, Atlanta, Ga., and Altu V. Lee, III, Dothan, Ala., and others too numerous to list, for plaintiffs.

E. Burns Parker, U. S. Atty., Montgomery, Ala., and Allen Crenshaw, Washington, D. C., Atty., Interstate Commerce Commission, and many others representing intervenors.

Before RIVES, Circuit Judge, and KENNAMER and LYNNE, District Judges.

RIVES, Circuit Judge.

This action was brought to enjoin and set aside an order of the Interstate Commerce Commission entered on May 8, 1951.[3] The jurisdiction of this court is invoked under 28 U.S.C.A. §§ 1336, 1398, 2284, and 2321–2325, inclusive. By agreement of counsel for the respective parties the case is now before the court on the petition for a temporary and permanent injunction.

The plaintiff and other rail carriers in southern territory filed with the Interstate Commerce Commission schedules to become effective October 10, 1949, proposing a general reduction in their rates on fuel oil, gasoline, and other refined petroleum products, in tank car loads, from refineries, pipe line outlets, and water terminals served by them to destinations within distances of 200 miles at which there are facilities for unloading tank cars. The Commission suspended the operation of these schedules until May 10, 1950, that is for the full seven months permitted by statute. 49 U.S.C.A. § 15(7), and conducted hearings concerning the lawfulness of such rates beginning January 10, 1950. On April 28, 1950, Division 3 of the Commission, with one Commissioner dissenting, issued an order cancelling the suspended schedules. The dissenting Commissioner thought the proposed rail rates justified; the other two Commissioners of Division 3 found "that the proposed schedules are not shown to be just and reasonable, but that respondents have justified rates which would be not less than those on the basis of the scale set forth in the appendix hereto."[4] The rail carriers acquiesced in this order of Division 3 and published new rates in conformity with the findings. National Tank Truck Carriers, Inc., filed a petition for suspension of the new rates, but they were permitted to become effective on July 16, 1950. Later the full Commission reconsidered the Division 3 order but without the introduction of any further evidence. On May 8, 1951, the Commission issued the order here complained of. It affirmed the prior finding that the schedules as proposed are not shown to be just and reasonable, but modified the minimum rates approved by Division 3 by substituting a new scale of minimum rates ranging up to 8.5¢ per hundred pounds higher than the minimum rates approved by Division 3. The respondent rail carriers were ordered to cease and desist on or before July 17, 1951, from charging or collecting rates lower than those on the basis prescribed by the order of May 8, 1951. A petition of the

3. Investigation and Suspension Docket No. 5710, Petroleum in Southern Territory, Rail, 280 I.C.C. 755.

4. Investigation and Suspension Docket No. 5710, Petroleum in Southern Territory, Rail, 278 I.C.C. 323.

rail carriers for leave to file a petition for reopening and reconsideration of this order was granted, but the petition for reopening and reconsideration was denied. Later the rail carriers filed a complaint before the Commission against the motor carrier rates with which they were competing, and at the same time filed a petition for further suspension of the minimum schedule of rates prescribed by the order of May 8, 1951. The Commission refused to act on the last petition for suspension before the effective date of the new minimum rates, and thereupon the complaint in this cause was filed and the enforcement of the order of the Commission of May 8, 1951, was temporarily restrained.

The plaintiffs complain that the order of May 8, 1951, sets a schedule of minimum rail rates which are so unreasonably high as to prevent plaintiffs from competing for the petroleum traffic with public and private motor carriers.

There is no dispute about the historical background of the case. Prior to World War II the railroads operating in the southern territory enjoyed at least a fair division of the transportation of petroleum and petroleum products. In 1942 two great pipelines in the South, the Southeastern Pipeline running from Port St. Joe, Florida, to Chattanooga, Tennessee, and the Plantation Pipeline, running from the oil refineries at Baton Rouge, Louisiana to Friendship, North Carolina, with important branch lines, were put into operation, greatly shortening the potential rail or truck haul to the ultimate consumer point, so that now the larger part, about 83.15%, of the gasoline traffic in the South by truck or rail moves less than 200 miles.

During World War II, in the year 1942, Office of Defense Transportation Order No. 7 was issued, which, as amended, prohibited the rail lines from hauling petroleum products without special permit to any point within a radius of 200 miles from its point of origin. Naturally this order gave rise to a fast growth of the tank-truck industry. The ban of this order was lifted in August, 1945, and for a couple of years thereafter the railroads were able to regain a limited share of the petroleum traffic moving for distances of less than 200 miles. In the years 1947, 1948, and 1949, three successive general increases in rail rates on all traffic were made to meet constantly uprising operating costs. The Commission found that "since January 1, 1947, when the first post-war horizontal increases became effective permanently, there has been a steady diversion of petroleum traffic from tank cars to private and common carrier trucks in the South." Continuing, the Commission found "although consumption of gasoline and fuel oil in nine southern states, not including Louisiana, had almost doubled between 1940 and 1948, rail carriers handled about a million tons less of those commodities in 1948 than in 1940." The Commission further found that the rail carriers are "faced with a continuing and increasing loss of this traffic."

As to the relative costs of rail and motor transportation, the opinion of Division 3 included a brief table from which we extract the following comparative costs in cents per one hundred pounds.

|  |  | Total Motor Costs | Fully Distributed Rail Costs |
|---|---|---|---|
| 50 | miles | 8.2¢ | 9.3¢ |
| 100 | miles | 15.2 | 12.4 |
| 150 | miles | 20.8 | 15.6 |
| 200 | miles | 27.3 | 18.7 |

From such a comparison Division 3 concluded that "it appears that rail costs are lower for distances in excess of 50 miles." After further discussion that Division further found "the evidence before us indicates that for distances up to about 50 miles motor transportation of petroleum has an inherent cost advantage but that for greater distances the rail carrier is the low cost agent."

A comparison of the minimum rail rates with the minimum common carrier tank-truck rates is more difficult for the reason that no minimum scale on a regional basis has been prescribed for tank-truck rates. The Commission found that "the illustrations of common carrier tank-truck rates of record indicate that the rail rates which were proposed are, on the average, about 1.3¢ lower." So estimating the existing truck rates, a comparison follows of those rates with the minimum rail rates prescribed by the order here complained of:

| Mileage Blocks Ending With | Existing Truck Rates Based on Finding of 1.3 Cents Higher Than Proposed Rail Rates | Rates Promulgated by Order of May 8, 1951 |
|---|---|---|
| 15 | 6.8 | 6 |
| 20 | 6.8 | 6 |
| 25 | 6.8 | 6.5 |
| 30 | 7.3 | 7 |
| 35 | 7.8 | 7 |
| 40 | 7.8 | 7.5 |
| 45 | 8.3 | 8 |
| 50 | 8.3 | 8.5 |
| 55 | 8.3 | 9 |
| 60 | 8.3 | 9.5 |
| 65 | 10.3 | 10 |
| 70 | 10.3 | 10.5 |
| 75 | 11.3 | 11 |
| 80 | 11.3 | 11.5 |
| 85 | 12.3 | 12 |
| 90 | 12.3 | 12.5 |
| 95 | 13.3 | 13 |
| 100 | 13.3 | 13.5 |
| 105 | 13.3 | 14 |
| 110 | 13.8 | 14.5 |
| 115 | 14.8 | 15 |
| 120 | 15.3 | 15.5 |
| 125 | 15.8 | 16 |
| 130 | 16.3 | 17 |
| 135 | 16.8 | 17.5 |
| 140 | 17.3 | 18 |
| 145 | 17.8 | 18.5 |
| 150 | 18.3 | 19 |
| 155 | 19.3 | 19.5 |
| 160 | 19.3 | 20 |
| 165 | 20.3 | 21 |
| 170 | 20.3 | 22 |
| 175 | 21.3 | 22.5 |
| 180 | 21.3 | 23 |
| 185 | 21.3 | 23.5 |
| 190 | 21.3 | 24 |
| 195 | 22.3 | 24.5 |
| 200 | 22.3 | 25 |

A comparison of the rates proposed by the railroads with the minimum rates allowed by the 3rd Division and with those prescribed by the order here complained of is fairly indicated by the following table:

(1) Petroleum and Petroleum Products, C.L.
In Tank Cars In Cents Per Hundred Pounds

| Mileage Blocks Ending With | Rates Proposed By Railroads | I. & S. 5710 Scales | |
|---|---|---|---|
| | | 1st Prescribed: (April 28, 1950) (See Note) | 2nd Prescribed: (May 8, 1951) (See Note) |
| 15 | 5.5 | 6 | 6 |
| 20 | 5.5 | 6 | 6 |
| 25 | 5.5 | 6.5 | 6.5 |
| 30 | 6 | 7 | 7 |
| 35 | 6.5 | 7 | 7 |
| 40 | 6.5 | 7.5 | 7.5 |
| 45 | 7 | 8 | 8 |
| 50 | 7 | 8 | 8.5 |
| 55 | 7 | 8.5 | 9 |
| 60 | 7 | 8.5 | 9.5 |
| 65 | 9 | 9 | 10 |
| 70 | 9 | 9.5 | 10.5 |
| 75 | 10 | 9.5 | 11 |
| 80 | 10 | 10 | 11.5 |
| 85 | 11 | 10 | 12 |
| 90 | 11 | 10.5 | 12.5 |
| 95 | 12 | 10.5 | 13 |
| 100 | 12 | 11 | 13.5 |
| 105 | 12 | 11.5 | 14 |
| 110 | 12.5 | 11.5 | 14.5 |
| 115 | 13.5 | 12 | 15 |
| 120 | 14 | 12 | 15.5 |
| 125 | 14.5 | 12.5 | 16 |
| 130 | 15 | 12.5 | 17 |
| 135 | 15.5 | 13.5 | 17.5 |
| 140 | 16 | 13.5 | 18 |
| 145 | 16.5 | 14 | 18.5 |
| 150 | 17 | 14· | 19 |
| 155 | 18 | 14.5 | 19.5 |
| 160 | 18 | 14.5 | 20 |
| 165 | 19 | 15 | 21 |
| 170 | 19 | 15 | 22 |
| 175 | 20 | 15.5 | 22.5 |
| 180 | 20 | 15.5 | 23 |
| 185 | 20 | 16 | 23.5 |
| 190 | 20 | 16 | 24 |
| 195 | 21 | 16.5 | 24.5 |
| 200 | 21 | 16.5 | 25 |

NOTE: These rates are subject to Ex parte 175 increases. I & S. Docket 5710, 2nd prescribed (May 8, 1951) *not* subject to Ex parte 175 increases.

Basically the first matter for consideration goes to whether the Commission has statutory authority to regulate the amount of rate reduction proposed by railroads for the purpose of meeting competition with another form of transportation, so long as such rate reduction reflects the exercise of managerial discretion and the rates are not less than compensatory to the railroads. The plaintiffs insist that the railroads are free to adjust their rates so long as the adjusted rates are within the zone of reasonableness.[5]

In the recent case of N. Y. Central R. R. Co. v. United States, D.C., 99 F.Supp. 394, 398, affirmed by the Supreme Court of the United States, I. C. C. v. New York Cent. R. R., 72 S.Ct. 201, 342 U.S. 890, Circuit Judge Magruder approved the following statement of the principle as sound, and adequately supported by authority:

"* * * carriers are free to adjust their rates 'to meet competition, so long as the adjusted rates are within the 'zone of reasonableness' and result in no undue prejudice or preference or discrimination prohibited by the statute."

In this connection, we are impressed with the force of the insistence of the intervening defendants, as set forth in their brief:

"The intervening tank-truck defendants are, generally speaking, engaged in the transportation of no traffic other than petroleum products in tank trucks. They live or die on their ability to participate in that traffic on a rate basis consistent with some degree of carrier prosperity. In comparison, the same commodities contribute a relatively small portion of the total railroad revenues. Any reduction in a tank-truck rate compelled by competition very quickly takes that rate to a point where it will not cover the expense directly incurred in the performance of the service. The railroads, on their part, can make much deeper cuts in rates for competitive' purposes without going below the expenses directly incurred in the service, since much of their expenses are fixed costs which must be incurred whether the particular traffic is transported or not. By reason of the circumstances just detailed, the railroads have the ability and the will, unless restrained by the Commission, to reduce rates on petroleum products to such a low level that the for-hire tank-truck industry could not possibly compete therewith and retain any degree of prosperity."

■ We think that the Commission has the power and jurisdiction to restrain rail rate deductions when necessary to enforce compliance with the National Transportation Policy, as declared by Congress, Act Sept. 18, 1940, 54 Stat. 899, Sec. 1, copied in Title 49 U.S.C.A. at the beginning of Chapter 1, note preceding section 1.

In Eastern Central Motor Carriers Association v. United States, 321 U.S. 194, 206, 64 S.Ct. 499, 505, 88 L.Ed. 668, the Supreme Court noted that the Commission's task includes the duty of seeing that rates of different modes of transportation are coordinated in accordance with the national transportation policy, and continued:

"This, while intended to secure the lowest rates consistent with adequate and efficient service and to preserve within the limits of the policy the inherent advantages of each mode of transportation, at the same time was designed to eliminate destructive competition not only within each form but also between or among the different forms of carriage."

5. The plaintiffs cite in support of that position Texas & Pac. Ry. Co. v. United States, 289 U.S. 627, 53 S.Ct. 768, 77 L. Ed. 1410; U. S. v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023; United States v. Illinois Central R. R., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417; Interstate Commerce Commission v. Alabama Midland Ry. Co., 5 Cir., 74 F. 715, id. 168 U.S. 144, 172, 173, 18 S.Ct. 45, 42 L.Ed. 414; Skinner & Eddy Corp. v. United States, 249 U.S. 557, 564, 39 S.Ct. 375, 63 L.Ed. 772; Texas & Pac. Ry. Co. v. Interstate Comm. Commission, 162 U.S. 197, 16 S. Ct. 666, 40 L.Ed. 940; Chicago, M., St. P. & P. R. Co. v. United States, D.C. N.D.Ill., E.D., 8 F.Supp. 970, 973, 974.

We have no doubt that the Commission had authority to disapprove rates shown to be lower than necessary to meet competition, and to prescribe a minimum scale consistent with the national transportation policy.

We think also that the Commission had the power to prescribe a uniform mileage scale throughout a wide territory even though the transportation and competitive conditions in all parts of the territory do not reflect the same uniformity as the prescribed scale. Either a rail carrier or a motor carrier suffering injury from the order because of divergent conditions applicable to a particular situation has an appropriate remedy by application to the Commission requesting it to suspend the operation of the order in so far as it may affect the particular case. Georgia Public Service Commission v. United States, 283 U.S. 765, 772, 51 S.Ct. 619, 75 L.Ed. 1397.

The plaintiffs contend, however, that the Commission's order of May 8th, 1951, is invalid because it is not supported by the evidence in the record, is not supported by basic or essential findings of the Commission, and is actually contrary to the findings contained in the report and order. We should examine first the basic or essential findings required to support the Commission's order, for as said by Mr. Chief Justice Hughes, speaking for the court in Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 125, 75 L.Ed. 291:

"In the absence of such findings, we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit."

The defendants insist that the concluding two paragraphs of the report of the Commission of May 8, 1951, contain a sufficient statement of the Commission's reasons or basis for concluding that the rates in effect pursuant to the order of April 28, 1950, were not just and reasonable and for ordering the carriers to increase such rates to the basis of the minimum scale prescribed by its order. The concluding two paragraphs of the Commission's report of May 8, 1951, were as follows:

"Giving due consideration to the evidence before us and to the various provisions of the act, in the light of the declared National Transportation Policy, we conclude that in order to place tank-car transportation upon a reasonably competitive basis with tank-truck transportation of this petroleum traffic for distances of 200 miles and less in the South, the scale of minimum rates approved in the prior report should be modified by the substitution therefor of the scale of minimum rates shown as an appendix to this report.

"Upon reconsideration, we affirm the prior finding that the schedules as proposed are not shown to be just and reasonable. We further find that rates lower than those on the basis of the scale of rates set forth in the appendix hereto are, and for the future will be, unjust and unreasonable. An appropriate order will be entered."

The defendants rely strongly upon the case of Alabama Great Southern R. R. Co. v. United States, 340 U.S. 216, 71 S.Ct. 264, 268, 95 L.Ed. 225, and insist that the Court there held that findings that differentials had been "justified as reasonable" and that they were "necessary and desirable in the public interest" were sufficient to show the reason and basis for the order. In that case the Court said, 340 U.S. at page 221, 71 S.Ct. at page 268:

"Appellants' primary contention is that the Commission could not prescribe reasonable differentials between all-rail rates and joint rates in connection with the water carriers without proof of lower cost of the rail-barge service. Since the Commission had no valid proof as to the relative costs of the services, appellants insist that the Commission's order is arbitrary and capricious and its conclusions that the differentials are 'justified as reasonable' and 'necessary and desirable in the public interest' are not supported by substantial evidence and essential findings."

The Court found, however, 340 U.S. at page 224, 71 S.Ct. at page 270: "That judgment was legitimately rested on relevant factors other than lesser cost of service." One test quoted by the Court was whether "the report, read as a whole, sufficiently expresses the conclusion of the Commission, based upon supporting data * * *." We have so read the Commission's report and find ample supporting findings to justify the differentials. (See 270 I.C.C. 591, at pages 609 to 613.) The Commission did find that the differentials were not justified from the standpoint of cost of service (270 I.C.C. at page 606), but justified the differentials on other relevant factors.

In 340 U.S. on pages 227 and 228, 71 S.Ct. on page 272 of the opinion, the Court expressly approved the authorities holding the Commission to a duty of making "basic" or "quasi-jurisdictional" findings essential to the statutory validity of the order, and reiterated that enough must be "put of record to enable us to perform the limited task which is ours." Citing Eastern Central Ass'n v. United States, 321 U.S. 194, 212, 64 S.Ct. 499, 88 L.Ed. 668.

■ The rule of the cases cited has now been written into statute by the Administrative Procedure Act of 1946. 5 U.S.C.A. § 1007(b) requiring that "All decisions (including initial, recommended, or tentative decisions) shall * * * include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all the material issues of fact, law, or discretion presented on the record * * *." The defendants in their brief concede, as they must, that the requirement just quoted is applicable to the Interstate Commerce Commission. See Capital Transit Co. v. United States, D.C., 97 F.Supp. 614, 621; New York Cent. R. R. Co. v. United States, D.C., 99 F.Supp. 394, 404; Riss & Co., Inc., v. United States, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345.

■ We think that the parts of the Commission's report relied upon by the defendants state ultimate conclusions rather than basic findings.

The Commission found that unless the railroads were allowed to charge a rate that was lower than that charged by the tank trucks, there would be an increasing diversion of petroleum traffic up to 200 miles in distance from the rails to the trucks. (280 I.C.C. 758, 759). Consideration of that fact made imperative a comparison of minimum rail rates prescribed with existing truck rates. The only basis for such a comparison in the Commission's report was the finding heretofore quoted that the rail rates which were proposed are, on the average, about 1.3¢ lower than common-carrier tank-truck rates of record. That same finding was made by Division 3 in its report of April 28, 1950 (278 I.C.C. at page 327):

"From such examples of truck rates as are to be found in the record, it appears that the proposed rail rates, on the average, would be about 1.3 cents lower than the motor rates now in effect."

■ We must apply the basis found by the Commission rather than, as the intervening defendants would have us do, examine the evidence to see whether it will permit a finding more favorable to them. Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291. Upon that basis, as has been heretofore shown, it appears that in the order complained of the Commission set rates for the railroads which were on the average well above the truck rates. The effect of the Commission's order would be to force the railroads to charge more than the tank trucks for hauling the same property when in fact it costs the railroads less to do it and they do not furnish as broad a service. In this regard we think that the order violates the national transportation policy. A careful reading of the report of the Commission (Division 3) of April 28, 1950, 278 I.C.C. 323, and of the report of the Commission of May 8, 1951 (280 I.C.C. 755) leaves us with the impression that substantially the only fact recited in the latter report and not contained in the former is as follows:

"The fact that the respondents did not establish rates lower than the pro-

posed rates where higher than on the approved scale basis (meaning Division 3 schedule) is an indication that some of the rates approved are lower than necessary to meet competition."

The Commission apparently expressed the opinion that because plaintiffs did not reduce their rates for transporting petroleum products from 21¢ per hundred pounds for 200 miles to 16.5¢ per hundred pounds, the minimum prescribed by the Commission's order of April 28, 1950, the conclusion is justified that the 16.5¢ minimum prescribed by the Commission (Division 3) was lower than necessary to meet competition. Even if that be conceded, it would not follow that 21¢ per hundred pounds was lower than necessary to enable plaintiffs to meet competition or that 25¢ per hundred pounds, the minimum rate prescribed by the Commission for 200 miles in the order here complained of, was low enough to enable plaintiffs to meet competition.

The Commission found "the conclusion is warranted that in competing with trucks for this petroleum traffic respondents must maintain rates that are generally more than 1 cent lower than tank-truck rates between the same points". While so finding the Commission set minimum rates for the rail carriers on the average well above the truck rates. We are forced to hold that the ultimate conclusion of the report and order of May 8, 1951 and the rates promulgated thereby are not only unsupported by the findings contained in the report and order, but are actually contrary to such findings.

Since the only findings of fact necessary for consideration are contained in the Commission's report and order of May 8, 1951, and in the prior report and order of April 28, 1950, by Division 3 of the Commission, and since our conclusions of law are sufficiently set forth in the foregoing opinion we do not here make separate findings of fact and conclusions of law.

### Order and Decree

It is ordered, adjudged and decreed by the court that the order of the Interstate Commerce Commission, made and entered on the 8th day of May, 1951, establishing minimum mileage rates throughout southern territory, Investigation and Suspension Docket No. 5710, Petroleum in Southern Territory, Rail, be, and the same is, declared to be unlawful; is unsupported by essential findings, and is contrary to the findings contained in the Commission's report, and said order is therefore declared to be null and void and of no effect;

And it is further ordered, adjudged and decreed that the defendant, United States of America, be, and is, temporarily and perpetually enjoined from the enforcement, operation and execution of the order of the Interstate Commerce Commission, made and entered the 8th day of May, 1951, establishing minimum mileage rates throughout southern territory, Investigation and Suspension Docket No. 5710, Petroleum in Southern Territory, Rail.