PACIFIC INLAND TARIFF BUREAU, a corporation, Arrow Transportation Co. of Delaware, a corporation, System Tank Lines, Inc., a corporation, Howard R. Williams, Inc., a corporation, Weaver Bros., Inc., a corporation, Transport Service, Inc., a corporation, Portland Motor Transport, Inc., a corporation, Silver Eagle Company, a corporation, Blue Line Transportation Co., Inc., a corporation, James J. Williams, Inc., a corporation, Lee & Eastes, Inc., a corporation, Inland Petroleum Transportation Co., Inc., a corporation, Fleetway Transport, Inc., a corporation, Asbury Transportation Co., a corporation, Taber Tank Lines, Inc., a corporation, Rice Truck Lines, Inc., a corporation, Herb Meyer, Inc., a corporation, Big Bend Transport Co., a corporation, General Transport Co., a corporation, Valley Transport, Inc., a corporation, Geo. W. Taber, an individual, doing business as Geo. W. Taber Tank Trucks, Anna M. Barnes, an individual doing business as A. B. Transportation, Joe Bookshnis, Dora Goodman, R. W. Goodman and Edwin Goodman, doing business as Sun Transportation Co., Inland Navigation Company, a corporation, Upper Columbia River Towing Company, a corporation, Tidewater-Shaver Barge Lines, a corporation, Columbia Barge Lines, a corporation, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, American Federation of Labor, and Joint Council 37 Thereof, Plaintiffs,

v.

UNITED STATES of America, Chicago, Burlington & Quincy Railroad Company, a corporation, Great Northern Railway Company, a corporation, Northern Pacific Railway Company, a corporation, Chicago Milwaukee, St. Paul & Pacific Railroad Company, a corporation, Spokane, Portland & Seattle Railway Company, a corporation, North Pacific Coast Freight Bureau, a corporation, Union Pacific Railroad, a corporation, Defendants,

and

Interstate Commerce Commission, Intervening Defendant.

Civ. 7278.

United States District Court, D. Oregon. March 3, 1955.

Henry T. Ivers, Seattle, Wash., and William P. Ellis, William B. Adams, Portland, Or., for plaintiff Pacific Inland Tariff Bureau and motor carriers.

John Hickson, Thomas J. White and Norman E. Sutherland, Portland, Or., for barge lines.

James Landye, Portland, Or., for Teamsters Union.

Fletcher Rockwood and Roy F. Shields, Portland, Or., Roger J. Crosby, R. Paul Tjossem, and Charles F. Hanson, Seattle, Wash., and James A. Gillen, Chicago, Ill., for railroad defendants.

Stanley N. Barnes, Asst. Atty. Gen., James E. Kilday, John Guandolo, and Willard R. Memler, Sp. Assts. to Atty. Gen., and C. E. Luckey, U. S. Atty., and James W. Morrell, Asst. U. S. Atty., Portland, Or., for United States.

Edward M. Reidy, Chief Counsel, Samuel R. Howell, and Ellis V. Gregory, Washington, D. C., and William L. Harrison, San Francisco, Cal., for Interstate Commerce Commission.

Before POPE, Circuit Judge, McCOLLOCH, Chief Judge, and SOLOMON, District Judges.

SOLOMON, District Judge.

This action was brought to enjoin orders of the Interstate Commerce Commission entered November 25, 1953, in the proceeding entitled "Suspension Docket No. 6062, Petroleum in North Pacific Coast Territory" and in three related matters heard jointly therewith.[1] By a supplemental complaint, orders of the Commission dated April 19, 1954, were included.

Plaintiffs are a group of motor common carriers of bulk petroleum products, barge operators, and the Teamsters Union. Defendants are several railroads and the Interstate Commerce Commission. The United States of America, because of statutory necessity, 28 U.S.C.A. § 2322, was also made a party.

Defendant railroads, by schedules to become effective on January 10, 1953, proposed substantial rate reductions on interstate shipments of petroleum and petroleum products in tank carloads from and to points in Oregon, Washington, Idaho, Montana, and Wyoming. Most of the plaintiffs protested these rates. On January 9, 1953, the Commission ordered that an investigation of the lawfulness of the proposed rates be instituted and suspended their operation until August 9, 1953, the entire seven months period permitted by statute, 49 U.S.C.A. § 15(7). At the request of the Commission, the railroads voluntarily extended the suspension period until December 9, 1953.

At approximately the same time, several of the railroads sought authorization to establish and maintain rates on the transportation of petroleum products from points in Oregon, Washington, Idaho, and Canada, to Helena and Butte, Montana, without observing the long and short haul provisions of Section 4 of the Act. These two proceedings were consolidated for hearing with Complaint Docket Nos. 31110 and 31156, in which complainants protested the reduced railroad rates on transportation of certain petroleum products from points in Wyoming and Montana to points in Northern Idaho and Eastern Washington, and from the specified points in Montana to Spokane, Washington. These rates were protested but not suspended.

From March 30, 1953, to April 8, 1953, hearings on these four proceedings were held before an Examiner of the Commission at Portland, Oregon. The Commission's hearings were held cooperatively with the Public Utilities Commission of Oregon and the Washington Public Service Commission which were investigating proposed rate reductions on the intrastate movement of petroleum and petroleum products. It was agreed that any evidence adduced at the hearings could be used in each proceeding without restriction.

All parties waived a report by the Examiner. Oral argument was had before Division 2 of the Commission and, on June 9, 1953, the case was submitted to the Commission on the record, briefs, and oral arguments.

On November 25, 1953, Division 2 issued its report and orders which found that the suspended rates were just and reasonable.[2] Although these reduced rates would go into effect at 12:01 a. m., December 9, the Commission did not release the report and orders until December 4. Copies were sent to protestants by regular mail and arrived in Portland on December 8. However, on December 4, plaintiffs learned of the report and

---

1. Fourth Section Application No. 27614, Petroleum in North Pacific Coast Territory; No. 31110, Katherine M. Lee and Tim Babcock, doing business as Babcock and Lee et al. v. Chicago, Burlington & Quincy Railroad Company et al.; and No. 31156, System Tank Lines, Inc., et al. v. Great Northern Railway Company.

2. In the two complaint cases, Division 2 found that the rates were not shown to be unreasonable or otherwise unlawful and in the Section 4 Application exempted the carriers from the long and short haul provisions because it found the proposed rates, with certain exceptions, to be reasonably compensatory and justified.

order and secured a copy. This copy, sent airmail, reached plaintiff's attorneys on Saturday, December 5.

On December 6, plaintiffs, in a telegram to the Commission, requested a reconsideration by the full Commission of the orders of Division 2 and a stay pending reconsideration. Plaintiffs amplified this telegram by a second telegram on December 7. The telegrams requested immediate answers by wire collect.

On the morning of December 8, plaintiffs, having failed to receive an answer from the Commission, filed a complaint and presented to the court a motion for a restraining order prohibiting the railroads and the Commission from putting the orders of Division 2 into effect.

During the arguments by attorneys for both plaintiffs and defendant railroads, plaintiffs received a telegram from one Commissioner explaining that the Commission could not further suspend the rates and that it was too late for the railroads to suspend the rates voluntarily. At 4 p. m., on December 8, the court issued a temporary restraining order enjoining the railroad defendants and the Commission from putting into effect the rates suspended in 6062.

On December 16, plaintiffs filed a formal petition for reconsideration by the full Commission.

The railroads moved to dissolve the temporary restraining order and also opposed the granting of a temporary injunction on the ground that, since plaintiffs' petition for reconsideration had not been acted upon by the Commission, plaintiffs had not exhausted their administrative remedies. The motion to dissolve was denied and, on December 18, after a hearing, the court issued a temporary injunction.

Thereafter, the Commission re-opened the proceedings and, on April 19, 1954, issued its own report and findings. The full Commission adopted, with a few minor exceptions, the report of Division 2. It also made additional findings relative to the National Transportation Policy. On the same day, the Commission entered its order affirming the action of Division 2 and dismissing the complaint proceedings.

Plaintiffs then filed a supplemental complaint in which they attacked the full Commission's report on the same grounds set forth in the original complaint. All defendants answered the original and supplemental complaints on the merits. In addition, defendant railroads, in their answers, continued to contest the court's jurisdiction.

██ Although the supplemental complaint was filed after the Commission had reconsidered and affirmed the orders of Division 2, all parties agree the jurisdiction of the court is to be determined by the facts as they existed at the time the original complaint was filed.[3]

### Jurisdiction

The railroads first contend that plaintiffs have no standing in court other than on behalf of or as members of the general public because the Commission's order affects only railroad rates.

 Section 15(7) of the Interstate Commerce Act imposes upon the Commission the duty of investigating and determining the lawfulness of proposed rates. The National Transportation Policy Act of Sept. 18, 1940, c. 722, Title I, § 1, 54 Stat. 899,[4] is the policy which the

---

3. Notwithstanding this concession on the part of plaintiffs, if Rule 15(d) of the Federal Rules of Civil Procedure, 28 U.S. C.A., is to be given the broad and liberal construction suggested by Rule 1, the filing of a supplemental complaint should avoid a dismissal even though the original complaint failed to set forth facts showing an administrative determination which was then ripe for review. See concurring opinion of Judge Clark in Technical-

Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 200 F.2d 876, at page 879.

4. "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient

Commission must apply in determining the lawfulness of such rates. This policy includes consideration of the needs of competing forms of transportation. Eastern-Motor Carriers' Association v. United States, 1944, 321 U.S. 194, 206, 64 S.Ct. 499, 88 L.Ed. 668. Rates which are "unfair" or which reflect "destructive competitive practices" are unlawful.

The public has an interest in the maintenance of "reasonable charges" and of a national transportation system "adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense." 54 Stat. 899. Congress recognized this public interest by giving "any body politic or municipal organization" the right to challenge proposed rates. 49 U.S.C.A. § 13(1).

Congress also recognized that competing carriers whose existence depends upon the maintenance of a lawful rate structure have an interest in the enforcement of the Act. Any common carrier has the right to file a complaint concerning the lawfulness of any rate proposed by another common carrier and to require the Commission to take action in accordance with Section 15(7) of the Act. The right of a competitor to participate not only in such administrative proceedings but also in the courts has long been recognized. Carriers have an independent right under the Act to appeal a decision involving a competitor which they claim adversely affects them. Interstate Commerce Commission v. Oregon-Washington R. & Nav. Co., 1933, 288 U.S. 14, 53 S.Ct. 266, 77 L.Ed. 588; Federal Communications Commission v.

Sanders Brothers Radio Station, 1940, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037.

Except in unusual circumstances, if one form of carriage is cheaper, shippers will employ it exclusively. This was recognized in the Washington Public Service Commission's opinion on the intrastate aspects of this case, which stated:

"Even a slight differential in rail rates below the common carrier truck rates will prevent the common motor carrier from securing the traffic." [5]

Federal Courts have consistently exercised jurisdiction in cases in which public utilities have asserted that a regulatory body has imposed confiscatory rates. Oklahoma Natural Gas Co. v. Russell, 1923, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659; Pacific Telephone & Telegraph Co. v. Kuykendall, 1924, 265 U.S. 196, 44 S. Ct. 553, 68 L.Ed. 975.

By permitting the railroads to reduce their rates, the Commission has, in effect, required the motor carriers to reduce their rates. To deny the motor carriers the opportunity to have such rates judicially reviewed is indistinguishable in practice from a denial of an opportunity to challenge rates directly imposed upon them.

The railroads next contend that the United States is an indispensable party, 28 U.S.C.A. § 2322; that this court has jurisdiction only if the statutory procedure is followed and that 49 U.S.C.A. § 17(9) authorizes a suit to enjoin or set aside an order of the Commission only after an application for re-hearing, re-

---

service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a na-

tional transportation system by water, highway and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 49 U.S.C.A. note preceding § 1001.

5. Pacific Inland Tariff Bureau, Inc. v. North Pacific Coast Freight Bureau, dated December 18, 1953 T–8917.

argument, or reconsideration of an order of an appellate division or of the whole Commission has been disposed of "but not otherwise." The railroads conclude that since this action was instituted prior to the time the petition for reconsideration had been disposed of, plaintiffs' claims of irreparable injury are irrelevant and this court has no jurisdiction to enjoin or set aside the orders of the Commission.

■ Ordinarily one must await the conclusion of all available administrative proceedings before seeking judicial intervention. Myers v. Bethlehem Shipbuilding Corporation, 1938, 303 U.S. 41, 50, 58 S.Ct. 459, 82 L.Ed. 638. However, administrative " 'finality' is not * * * a principle inflexibly applied." Concurring opinion, Mr. Justice Frankfurter in Joint Anti-Fascist Refugee Committee v. McGrath, 1951, 341 U.S. 123, 156, 71 S. Ct. 624, 640, 95 L.Ed. 817.

Judicial intervention is permitted where the issue is solely one of law, Skinner & Eddy Corp. v. United States, 1919, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772, or where there is a showing of immediate and irreparable injury flowing from an inadequacy of the prescribed administrative procedure. Oklahoma Natural Gas Co. v. Russell, supra.

■ In these proceedings, the Commission claimed that its authority to suspend the proposed rates pending review by the whole Commission had been exhausted. The record of the proceedings before the Commission, considered independently from plaintiffs' affidavits, demonstrates that if the suspended rates are permitted to go into effect, plaintiffs could not be compensated for losses sustained and many might be forced out of business or into bankruptcy.

In Cantlay & Tanzola, Inc., v. United States, D.C.S.D.Cal.1953, 115 F.Supp. 72, at page 76, the railroads raised the same jurisdictional objections which the court overruled, holding:

"As to the ground first stated the danger of immediate and irreparable injury to plaintiffs, had they awaited action of the Commission on their petition for reconsideration, was sufficiently clear to warrant judicial intervention in advance of final administrative action by way of exception to 'the long-settled rule of judicial administration (see Eccles v. Peoples Bank, 1948, 333 U.S. 426, 434, 68 S.Ct. 641, 92 L.Ed. 784) that no one is entitled to judicial relief for a * * * threatened injury until the prescribed administrative remedy has been exhausted.' "

We agree.

The railroads' third jurisdictional contention is that the provisions of 49 U.S. C.A. § 17(9) establishes the right and prescribes the methods for judicial review of Commission orders, and is not superseded by the Administrative Procedure Act, 5 U.S.C.A. §§ 1001–1011.

■ The Administrative Procedure Act was intended to apply to the Interstate Commerce Commission. Page 5 of the Senate Report (Senate Report 752, 79th Cong. 1st Sess.) declares that:

" * .* * Manifestly it would be folly to distinguish between 'good' agencies and others, and no such distinction is made in the bill. The legitimate needs of the Interstate Commerce Commission, for example, have been fully considered but it has not been placed in a favored position by exemption from the bill."

The courts have construed the Act to apply to proceedings before the Interstate Commerce Commission. Chicago & E. I. R. Co. v. United States, D.C.S.D. Ind.1952, 107 F.Supp. 118, affirmed 344 U.S. 917, 73 S.Ct. 346, 97 L.Ed. 707; Atlanta & Saint Andrews Bay Ry. Co. v. United States, D.C.M.D.Ala.1952, 104 F. Supp. 193; Cantlay & Tanzola, Inc., v. United States, supra.

■ Plaintiffs are persons "adversely affected or aggrieved" by agency action within the meaning of 5 U.S.C.A. § 1009(a) and the order of Division 2 is final and permits judicial review unless the procedure set forth in 49 U.S.C.A. § 17(9) is included in the phrase "except as

otherwise expressly required by statute" appearing in 5 U.S.C.A. § 1009(c).

The following excerpts from the House Report (House Report 1980, 79 Cong. 2nd Sess.) are illustrative of the intent of Congress on the reach of the Administrative Procedure Act.

"The bill is meant to be operative 'across the board' in accordance with its terms, or not at all. Where one agency has been able to demonstrate that it should be exempted, all the agencies have been exempted in general terms." (page 16)

"The Bill is so drafted that its several sections and subordinate provisions are closely knit." (page 17)

"There is a fundamental inconsistency in requiring a person to continue 'exhausting' administrative processes after administrative action has become, and while it remains, effective." (page 43)

To deprive plaintiffs of the opportunity to have the action of the Commission judicially reviewed and to obtain the protection of the court in maintaining the status quo pending such review, would give an order of the Interstate Commerce Commission a preferred position which we do not believe Congress intended.

### Merits

Having found that this court had jurisdiction at the time the original petition was filed, we now consider the case on its merits.

The rate reductions proposed by the railroads pertain to the carload carriage of gasoline and light oils between Washington, Oregon, Idaho, and parts of Montana and Wyoming.[6]

Generally the proposed reductions fall into three geographical classifications:

(1) shipments from Puget Sound points and Portland, Oregon, to Spokane, Washington, and the surrounding area in the Upper Columbia River Basin, which is sometimes referred to as the Inland Empire;

(2) shipments originating and terminating within the Inland Empire:

(3) shipments from refineries and producing fields in Montana and Wyoming westward to the Inland Empire.[7]

6. This is the most recent of many cases which reflect the growing competition for the carriage of petroleum products in the Pacific Northwest. Past proceedings include: Petroleum between Washington and Oregon Points, 225 I.C.C. 382 (1937); Petroleum between Washington, Oregon, Idaho, Montana, 234 I.C.C. 609 (1939), affirmed as Scandrett v. United States, D.C.Or.1940, 32 F. Supp. 995, affirmed 312 U.S. 661, 61 S.Ct. 736, 85 L.Ed. 1108; Petroleum Products from Salt Lake City to Spokane, 273 I.C.C. 736 (1949); Inland Nav. Co. v. Big Creek and T. R. Co., 281 I.C.C. 515 (1951); Petroleum between Portland and Spokane, P. & S. Ry. Points, 286 I.C.C. 516 (1952).

7. Representative examples of the proposed reductions are:

| From | To | Present Rate ¢ per 100 lbs.* | Proposed Rate ¢ per 100 lbs.* |
| --- | --- | --- | --- |
| Portland, Ore. | Spokane, Wn. | 41 | 35 |
| Portland, Ore. | Pasco, Wn. | 27 | 20.5 |
| Pasco, Wn. | Spokane, Wn. | 24 | 20 |
| Portland, Ore. | Moscow, Id. | 50 | 37 |
| Portland, Ore. | Lewiston, Id. | 43 | 35 |
| Seattle, Wn. | Spokane, Wn. | 41 | 35 |
| Seattle, Wn. | Moscow, Id. | 50 | 37 |
| Seattle, Wn. | Lewiston, Id. | 43 | 35 |
| Spokane, Wn. | Moscow, Id. | 16 | 15 |
| Spokane, Wn. | Bonners Ferry, Id. | 19 | 17 |
| Spokane, Wn. | Port Hill, Id. | 32 | 20 |
| Spokane, Wn. | Perma, Mont. | 43 | 28 |

* The proposed rates include ex parte increases while the present rates generally do not include these permissive increases.

The railroads also proposed lowering the weight classification of certain distillate fuel oils from 7.75 pounds per gallon to 6.6 pounds per gallon.

Although the reduced rates on westbound traffic from Montana and Wyoming published by the railroads were protested by a few motor carriers, these rates were not suspended. This truck traffic of petroleum appears to be insignificant, and no serious effort was made to prosecute the complaints before the Commission. Plaintiffs in these proceedings have directed their attention to I & S 6062. In this Opinion, we shall do the same.

### Majority Report of the Commission

The majority report substantially repeated the findings and conclusions of Division 2, and also made certain additional findings relating to the national transportation policy. A summary of the majority report follows.

The railroads proposed rate reductions in an effort to secure petroleum traffic presently carried by unregulated proprietary tank trucks operated by oil companies, farm cooperatives, and distributors. The railroads also sought to meet competition from other common carriers, particularly a petroleum pipeline between Salt Lake City, Utah, and Pasco, Washington,[8] motor carriers and Columbia River barges.

In recent years, railroad carriage of petroleum products consumed in the Inland Empire has been steadily diminishing and now constitutes a small portion of the total consumption. Beginning in 1935, Columbia River barges have grown from an insignificant carrier to the dominant upstream carrier of petroleum.

The other important source of revenue for barges comes from the downstream carriage of wheat. In 1952, approximately 1/13th of the total wheat production in counties adjacent to the Columbia River was carried downstream by barges. Farm cooperatives in these counties are interested in continuing barge service because of its economy and transportation characteristics.

All shippers except Standard Oil Company of California[9] depend upon upstream petroleum tank farms maintained by several barge operators on the Columbia River. However, oil companies and distributors own storage facilites at numerous interior points not serviced by railroads.

The Salt Lake City-Pasco pipeline is a common carrier owned by a subsidiary of Standard. When this pipeline was completed, Standard was dissatisfied with the rate structure of motor common carriers. It therefore acquired a fleet of trucks to haul petroleum from the pipeline terminus to its bulk storage facilities. However, Standard has given no indication of its plans if the proposed rates become effective.

The average cost to Standard of ocean shipment of petroleum from California to Pasco, including terminal expenses, is 24.7¢.[10] Standard's cost of shipping from Pasco to Spokane by proprietary trucks is 19.5¢.

Some of the oil companies operate their trucks on a 24-hour basis six days a week. These long hours permit low cost per gallon transportation. Neither the common carriers by rail or by truck, under their present rate levels, can compete with distributors who transport petroleum products owned by them over the highways in their own tank trucks.

In addition to proprietary trucks which deliver petroleum to bulk storage points, many of the oil companies use their own trucks to transport petroleum from bulk storage points to retail outlets. This is known as "clipper service." It is unlikely that any common carrier rate re-

8. Since the hearing, this pipe-line has been extended to Spokane, Washington. In view of the undisputed evidence that no form of common carrier can compete with a pipe-line, we question the present pertinence of much of the argument and evidence before the Commission.

9. Hereinafter referred to as "Standard."

10. All shipping costs are for 100 pounds unless otherwise specified.

duction would induce oil companies to discontinue their clipper service.

The barge rate from Portland to Pasco is 13¢. In addition, there is an optional charge for insurance and accountability (an allowance for evaporation), but all major oil companies bear these risks themselves. All except Standard pay 2½¢ for handling at public facilities. The total barge factor for transporting petroleum from Portland to Pasco is 15.7¢.

Petroleum originating in Salt Lake City is moved to Pasco by pipeline at a cost of 65¢ per barrel or 23.5¢ per hundred pounds. The truck or railroad charges for petroleum transported from Pasco to Spokane are the same whether the petroleum reached Pasco by barge or pipeline. The expected cost by the new pipeline from Pasco to Spokane will be only 9¢, which is 11¢ lower than the proposed railroad rate.

In proposing these new rates, the railroads relied in part upon an investigation made to determine the rate level necessary to capture traffic handled by proprietary trucks and also to enable Montana and Wyoming producers to ship distress residual products to the Inland Empire. The proposed scale is somewhat higher than the 270 mile scale approved in Petroleum Products in Illinois Territory, 280 I.C.C. 681-695 (1951).[11]

Railroad carriage of petroleum does not require unusual expenditure or preparation on comparison with many other commodities. However, the record was inadequate to warrant a finding as to the relationship between the cost of servicing petroleum and other commodities.

Barge operators testified to the economic necessity of maintaining two-way traffic, but gave no specific evidence on this issue. Nor did they offer evidence of net revenue and operating expenses. Their evidence was insufficient to provide a basis for determining rate levels needed to permit profitable operation.

The motor carriers gave little evidence of petroleum volume between specific points. Motor carriers do not compete with the pipeline and barge carriers, but supplement those services by carrying from their termini. Records of thirteen motor carriers showed that if they had met the proposed rates in 1952, their revenues would have totaled $7,878,707 instead of $8,364,979. The following language sets forth the views of the majority on the manner of compensating for any revenue deficiency:

> "There is, however, no convincing evidence that the rate reductions proposed by the respondents would necessitate or occasion the establishment of lower rates by motor carriers to the large number of bulk distributing facilities now served by them and situated in areas not traversed by a railroad line, nor to bulk facilities in towns and cities traversed by one or more railroads which are so far from rail tracks as to require the unloading of petroleum products from railroad tank cars into containers adjacent to railroad tracks and later the reloading of those products into motor vehicles for transportation to ultimate distributing points."

If the downward trend in railroad traffic were to continue, "it appears certain that the railroads would be entirely eliminated as carriers of these products to destinations in the states of Washington, Idaho, and Oregon, contrary to the national transportation policy and the national defense, reference to which is made by the protestants."

The basic finding concerning adequacy of railroad revenue to be produced under the proposed rates was that:

> "The proposed rates would produce net operating revenue per

11. There is no finding showing the relationship between the rates approved in the Illinois Territory and the general rate structure there. Neither was there a comparison between the rate structure in the Illinois and North Pacific Territory. A rate considered in a vacuum has little value.

gross-ton mile ranging from 18 to 853% more than the corresponding revenue received by them from all commodities."

Even though system average figures are open to criticism, Northern Pacific Ry. Co. v. Department of Public Works of State of Washington, 1925, 268 U.S. 39, 45 S.Ct. 412, 69 L.Ed. 836, the majority of the Commission relied upon its earlier opinion in the case of Petroleum Between Washington, Oregon, Idaho, Montana, 234 I.C.C. 609, for the proposition that " * * * exactness is not necessary, especially in view of the wide margin of error between the expense figures and the revenue figures." The satisfactory financial position of the railroads supported their contention that the proposed rates would not cast a burden on other traffic. The proposed rates are reasonably compensatory, no lower than necessary to meet competition and "would not contravene any of the provisions of the national transportation policy."

The majority concluded:

" * * * We further find, in Investigation and Suspension Docket No. 6062, that the proposed rates are reasonably compensatory and in harmony with the national transportation policy of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense." [12]

### Minority Report

Commissioner Knudsen dissented.[13]

He characterized the findings relating to the national transportation policy as:

" * * * unsupported * * * for nowhere in the balance of the report do I discover ancillary findings of fact from the record that would support this conclusion. The railroad respondents in this proceeding transport many hundreds of different commodities. The barge lines and the motor carriers who are protestants, survive, if at all, on their ability to transport but a few commodities, principal among which are petroleum products."

Commissioner Knudsen asserted that the Commission had subordinated water and motor carriers to the railroads. He analyzed the Pacific Northwest petroleum transportation struggle as arising from the pipeline, which had created a competitive situation requiring some stabilizing action by the Commission.

The dissenting Commissioner found that the majority decision violated the national transportation policy because:

"In my opinion, it is demonstrated by the record that protestants will be more endangered by these substantial decreases in railroad rates than the railroads would be if the status quo were preserved in the interest of better rate stabilization. National defense requires the presence of all kinds of carriers, to be available in the event of a defense emergency. Quite obviously the unsupported findings in the conclusion of this report were thought necessary because of the decision of the Federal Court in Cantlay & Tanzola,

12. The report of Division 2 merely noted protestants' allegations of violations of the national transportation policy, but made no findings. Plaintiffs originally sought relief from the report and order of Division 2.

13. On identical evidence the Washington Public Service Commission also reached an opposite conclusion from the majority report. Washington Public Service Commission v. North Pacific Coast Freight Bureau, Cause No. T–8917, decided December 18, 1953. The Washington Commission found "that the rails have not proven as required by the statute that the proposed rates are just and reasonable for state wide application as proposed." However, because of competitive necessity the Washington Public Service Commission abandoned its policy of maintaining parity between truck and rail rates to points requiring parity between intrastate and interstate traffic, but elsewhere denied the reduction.

Inc., v. United States, [D.C.], 115 F. Supp. 72,"

and he concluded:

" * * * there is substantial evidence of defense necessity under the terms of the national transportation policy upon which the Commission could make a finding, if it chose that the national defense is best served by not allowing the railroads to foster what might well develop into another local petroleum war. * * "

■ This court has a limited function. It is not a rate making body and does not measure the judgment of the Commission against its own judgment. The Commission is the expert body charged by Congress with the duty of regulating transportation rates.

In a series of decisions the Supreme Court has held that the Commission must make findings characterized as "jurisdictional", "quasi-jurisdictional," "indispensable" or "basic." Judge Learned Hand reviewed these decisions in Baltimore & Ohio R. Co. v. United States, D. C.N.D.N.Y.1937, 22 F.Supp. 533, at page 537:

"The Supreme Court has been increasingly insistent upon the necessity of findings upon the pivotal facts. The defendant says that in State of Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077, the Commission's very jurisdiction to regulate intrastate rates hinged upon a finding that they directly affected interstate rates; and that here no jurisdictional facts are at issue. 'Jurisdiction' is a treacherous word; we are not clear that the Commission's jurisdiction is not involved; but in any event in United States v. Baltimore & Ohio R. R. Co., 293 U.S. 454, 464, 55 S.Ct. 268, 272, 79 L.Ed. 587, it was expended to 'quasi-jurisdictional,' which was meant to cover all 'indispensable' facts; and in United States v. Chicago, Milwaukee, St. Paul & P. R. R. Co., 294 U.S. 499, 504, 55 S.Ct. 462, 464, 79 L.Ed. 1023, the phrase,

'basic or quasi-jurisdictional facts' was subsituted, as in Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288. What findings are 'basic' is a practical matter; those are such which we need to ascertain on what legal theory the Commission has proceeded".

■ Orders of the Commission not supported by proper findings cannot be sustained. The Supreme Court in State of Florida v. United States, 1931, 282 U. S. 194, 215, 51 S.Ct. 119, 125, 75 L.Ed. 291 held:

"In the absence of such findings, we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit."

See also United States v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 1935, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023; Atlanta & Saint Andrews Bay Ry. Co. v. United States, supra; 5 U.S.C.A. § 1007(b).

■ The Commission is governed by the legislative instruction set out in the national transportation policy. King v. United States, 1952, 344 U.S. 254, 263–264, 73 S.Ct. 259, 97 L.Ed. 301; United States v. Rock Island Motor Transit Co., 1951, 340 U.S. 419, 434–435, 71 S.Ct. 382, 95 L.Ed. 391; Interstate Commerce Commission v. Parker, 1945, 326 U.S. 60, 66, 65 S.Ct. 1490, 89 L.Ed. 2051.

■ Findings as to the national transportation policy are basic or quasi-jurisdictional in nature. While this court may not be qualified to determine which program will best promote the public interest in accordance with the national transportation policy, the Commission must make sufficient findings for us to determine whether it has applied "its familiarity with transportation problems to these conflicting considerations." American Trucking Associations, Inc., v. United States, 1953, 344 U.S. 298, 314, 73 S.Ct. 307, 316, 97 L.Ed. 337.

Only one finding relative to the national transportation policy was not of the type condemned in New York Cent. R. Co. v. United States, D.C.D.Mass.1951, 99 F.Supp. 394, affirmed Interstate Commerce Commission v. New York Cent. R. Co., 342 U.S. 890, 72 S.Ct. 201, 96 L.Ed. 667, as being merely a statement of the Commission's ultimate conclusions. This finding was that the railroads "would be entirely eliminated as carriers of these products to destinations in the States of Washington, Idaho, and Oregon, contrary to the national transportation policy and the national defense." It is basic only if supported by other findings, such as a finding that the loss of this traffic would jeopardize the financial condition of the railroads.

Various provisions of the national transportation policy were merely noted but not considered by the Commission. For example, there are no basic findings concerning "developing, coordinating, and preserving a national transportation system by water, highway, and rail."

The Commission considered the motor carriers' contention that the proposed reduction would force them out of the petroleum carrying business and answered it by the suggestion heretofore quoted that the motor carriers could continue to operate by maintaining the higher rates to and from communities or areas in communities which the railroads do not serve. We doubt the propriety or legality of such suggestion.

■ A carrier may institute rates yielding a revenue below that which a public body could compel it to accept, Baltimore & O. R. Co. v. United States, 1936, 298 U.S. 349, 379, 56 S.Ct. 797, 80 L.Ed. 1209, but such rates must now be in accord with the national transportation policy. The burden of proving that a change in rate or classification is just and reasonable is upon the carrier making the proposal. 49 U.S.C.A. § 15(7).

The Commission, relying upon Exhibit 52, found that the proposed rates were just and reasonable and would not cast a burden upon other traffic. Exhibit 52 is a statistical summation of system average expenses of the railroads and their expected revenues from the proposed rates.

The Commission recognized that system average figures were open to criticism and were not a satisfactory basis for any exact finding. However, it found that:

"* * * The proposed rates would produce net operating revenue per gross-ton mile ranging from 18 to 853 per cent more than the corresponding revenue received by them from all other commodities."

It also found that when such a wide margin for error exists, it is proper to conclude that the proposed rates will be highly remunerative.

The Commission misread Exhibit 52. That exhibit does not show that the expected revenues from the proposed rates would range from 18 per cent to 853 per cent "more" than the system average expenses, but rather that the expected revenues would range from 18 to 853 per cent "of" the system average expenses. In other words, instead of the expected revenues all being in excess of system average expenses, between certain points they are less than one-fifth of the system average expenses.

Nor did the Commission make any finding comparing average expenses in the affected area with the proponents' system average expenses. In the proceeding which resulted in Scandrett v. United States, supra, the Commission found that expenses in Washington and Oregon, including prorated overhead items, were respectively 3.6 and 3.8 mills per gross ton mile, while the system average expenses were only 2.7 mills per gross ton mile. We do not know whether the Commission found that this disparity exists today.

■ The misreading of Exhibit 52 and the necessity of more accurate cost

studies become even more significant when the supposed excess yield from the proposed rates is examined on the principal routes. For example, on the Portland to Pasco to Spokane route, expected revenues range from 1½ to 3 times the system average expenses, depending upon the particular carrier. Even though precision or exactness is not required, the Commission must have some reasonable basis for determining the revenues to be produced by a proposed rate.[14] State of Florida v. United States, 1934, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077. There is no such evidence in this record.

 In addition to the total failure of proof to support the Commission's findings that the proposed rates are just, reasonable and compensatory, the conclusions made by the Commission concerning the national transportation policy were not supported by the evidence.

Except for the one contention that they would be wiped out as petroleum carriers and hence lose revenue, the railroads introduced no evidence from which the Commission could find that the proposed rates were in accord with the national transportation policy.

On the other hand, the evidence of the barges and motor carriers as well as of the farm groups and other intervenors showed that survival of the barge and truck lines was necessary for agricultural marketing and national defense. Farm cooperative representatives testified that because the railroads were unable to furnish adequate service during the harvest season, their members were forced to store wheat on the ground. Unlike the railroads, the barges were able to rapidly load large quantities of wheat, which enabled the marketing cooperatives to function efficiently. A Department of Agriculture representative confirmed the testimony of the farm cooperative witnesses that the national transportation policy was involved in this case. This testimony is significant if the future operations of barges on the Columbia River is dependent upon their continuing to carry both wheat and petroleum.

Barge and truck operators testified to their services in regard to national defense. For a period of two years during World War II, Pacific Northwest petroleum needs were served exclusively by barges and trucks. At the present time, barge service permits the large scale movement of high explosives without passing through populated centers. Motor carriers are now rapidly moving aviation fuel between air bases in order to facilitate flights of large numbers of military airplanes.

The record, therefore, shows that the Commission, had it chosen, could have made supporting findings relating to the national transportation policy. However, it neither accepted nor rejected the evidence which we have briefly summarized.

The proposed rate structure was based primarily on an attempt to meet the combined barge-proprietary truck cost from Portland to Pasco to Spokane. The proposed 35¢ rail rate is based upon a 15.5¢ barge cost and Standard's proprietary truck cost between Pasco and Spokane of 19.5¢. The Commission found that the proprietary trucks are operated on such an efficient basis that common carriers by truck are unable to offer lower rates than the cost of proprietary operation. Common carrier truckers testified that they had to maintain equipment to handle fluctuating shipments. Although not essential to our decision,

14. We recognize that the Commission has the right to select and determine its own standards of proof. It may be significant that in a prior study over the major route involved in these proceedings, Petroleum Between Portland and Spokane P. & S. Ry. Points, supra, actual cost figures which have long been recognized as more desirable, were furnished the Commission.

486

we question whether there is a distinction between reducing railroad rates to end competition from a petroleum pipeline to the detriment of competing common carriers, and similarly reducing railroad rates to end competition from these proprietary trucks. Both the courts and the Commission have prohibited the railroads from lowering rates to end pipeline competition to the detriment of competing common carriers. Cantlay & Tanzola, Inc., v. United States, supra, Petroleum Products from Salt Lake City to Spokane, supra.

In addition to the general rate reduction, the railroads proposed to reduce the shipping weight of affected petroleum products by 15 per cent. The weight reduction would result in a rate reduction. We do not believe that this reduction is severable from the whole plan proposed by the railroads.

The Commission's criticism of the inadequate evidence offered by barge and truck operators as well as by the railroads is well founded. The Commission is not a passive arbitrator of disputes between carriers. It is the instrument chosen by Congress to regulate interstate commerce in the public interest. When carriers fail to produce satisfactory evidence, the Commission may require them to produce additional and more satisfactory evidence. It may make its own investigation. It may consult with "other, interested and presumably better-informed agencies of the Government as to particular questions". Cantlay & Tanzola, Inc., v. United States, supra, 115 F. Supp. 81. However, the record does not disclose that any of these courses was followed in this case. The fate of our national transportation system should not depend upon evidence either offered or withheld by competing carriers.

The temporary restraining order and injunction heretofore issued will be made permanent. Attorneys for plaintiffs shall submit findings of fact, conclusions of law and a judgment in accordance with this opinion.